RUSH, Justice.
Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive — so we review them with great deference to the trial courts, recognizing their superior vantage point for weighing the evidence and assessing witness credibility. Because a case that seems close on a “dry record” may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence.
We granted transfer to reiterate that caution. Father’s eventual efforts to establish a relationship with his children were commendable, and DOS’s family preservation efforts with him could have been stronger. Yet the standard of review requires us to consider only the evidence favorable to the judgment — and in turn, to respect the trial court’s reasonable conclusion that Father’s efforts were both too little in view of his violence and earlier pattern of hostility toward services, and too late in view of the children’s urgent need for permanency after several years in out-of-home placement. The evidence was sufficient to support termination, so we defer to the trial court and affirm its judgment.
Facts and Procedural History
In late 2008, one-year-old E.M., his newborn sister ELM., and their five older half-siblings [1] were adjudicated CHINS, based on reports of Father’s repeated domestic violence against Mother. The children were initially allowed to remain in the home on the condition that Father stay away, but were removed a few months later after Father violated that condition.
Besides the order to stay away from the home, the CHINS disposition also required Father to establish his paternity of E.M. and E1.M.; to undergo a psychological evaluation and counseling for domestic violence, anger management, and parenting; and to have only supervised visits with the children. His only efforts in those matters consisted of attending two domestic-violence counseling sessions and (viewing disputed evidence favorably to the judgment) a single visit with the children after they were removed from the home. Moreover, Father was hostile and verbally abusive to service providers, and he denied that any domestic violence had occurred— even though police identified him as the aggressor in a March 2009 incident, shortly after the children’s removal, where he admittedly bit Mother’s face and Mother stabbed him in the abdomen. Father failed to appear for all but the first two CHINS hearings, then dropped out of contact with DCS. As a result, DCS discontinued services to Father in mid-2009 — and unbeknownst to DCS, Father was incarcerated in Illinois for a felony firearm conviction beginning in September 2009.
By mid-2010, Mother too had fallen out of compliance with services, and the children had been removed from the home for more than fifteen of the previous twenty-two months. DCS therefore petitioned to *641 terminate Mother’s and Father’s parental rights, and adoption by relatives became an alternative permanency plan. And by early Spring 2011, E.M., El.M., and two of their half-siblings had been placed with their maternal grandmother R.E., who planned to adopt them.
Immediately after his release from prison in January 2012, Father contacted DCS, told them of his incarceration, and asked to resume visitation with E.M. and El.M. But DCS did not permit any visits because the visitation order had been conditioned on Father’s participation in court-ordered services, which he had abandoned — though he had completed parenting and anger-management classes in prison. Father also resumed attendance at hearings. But by then, adoption by R.E. had long since become the sole permanency plan, and DCS continued to pursue termination.
At the final hearing, the witnesses for DCS and CASA unequivocally recommended terminating Father’s parental rights. They explained that E.M.’s and El.M.’s older half-siblings had post-traumatic stress disorder (PTSD) and were afraid of Father because of the domestic violence they’d witnessed, and that there had never been any “bonding” between Father and E.M. and El.M. The children had been removed from the home for nearly three and a half years and were thriving in placement with R.E. As the Permanency Family Case Manager summarized, “[w]e can’t keep starting [the children] over,” because it would be unfair to them “to wait around for [the] parents to get on board” with reunification.
The trial court’s order essentially agreed with DCS’s view. It found that Father “continues to deny that he has issues with domestic violence,” that he “has not completed any counseling or therapy,” and “has not seen his children in over two years.” It acknowledged that Father “has recently attempted to comply with the case plan,” but noted that he also “had ample opportunity before his incarceration to comply, which he refused. The children cannot wait three years for a parent to comply.” The court therefore terminated Father’s parental rights, and he appealed.
A divided panel of the Court of Appeals reversed by unpublished memorandum decision. In re E.M., No. 45A03-1208-JT-370, 2013 WL 1919525 (Ind.Ct.App. May 8, 2013), trans. granted, 993 N.E.2d 182 (Ind. 2013). The majority held that the trial court unduly “emphasize[d] Father’s past conduct and minimizefd] his recent progress and efforts at the time of the termination hearing.” Op. at *5. The majority emphasized that despite Father’s early non-compliance, he had completed parenting and anger-management classes while in prison, contacted DCS upon his release in hopes of seeing the children, undergone a psychological evaluation, and completed or nearly completed additional parenting and anger-management classes by the time of the final hearing. Id. at *4-5. Thus, the majority concluded that the trial court placed too much weight on Father’s past conduct without sufficiently “taking into consideration evidence of changed conditions” at the time of the termination hearing. Id. at *5 (citing In re I.A., 903 N.E.2d 146, 154 (Ind.Ct.App.2009)). Judge Kirsch dissented without separate opinion. Id. at *6.
We granted transfer, vacating the Court of Appeals opinion, and now conclude that the Court of Appeals majority contravened the standard of review by reweighing the evidence. We therefore affirm the trial court’s judgment. Additional facts will be supplied as necessary.
Standard of Review
We have repeatedly recognized that “parental rights are precious and pro *642 tected by our Federal and State constitutions.” E.g., In re Adoption of C.B.M., 992 N.E.2d 687, 692 (Ind.2013). Accordingly, when seeking to terminate parental rights, DCS must prove its case by “clear and convincing evidence,” Ind.Code § 31-37-14-2 (2008) — a “heightened burden of proof’ reflecting termination’s “serious social consequences.” In re G.Y., 904 N.E.2d 1257, 1260-61 & n. 1 (Ind.2009).
But weighing the evidence under that heightened standard is the trial court’s prerogative — in contrast to our well-settled, highly deferential standard of review. “We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence.” Egly v. Blackford Cty. Dept. of Pub. Welfare, 592 N.E.2d 1232, 1235 (Ind.1992). We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. K.T.K. v. Indiana Dep’t of Child Servs., 989 N.E.2d 1225, 1229-30 (Ind.2013) (quoting In re I.A., 934 N.E.2d 1127, 1132 (Ind.2010)).
Reviewing whether the evidence “clearly and convincingly” supports the findings, or the findings “clearly and convincingly” support the judgment, is not a license to reweigh the evidence. Rather, it is akin to the “reasonable doubt” standard’s function in criminal sufficiency of the evidence appeals — in which “we do not reweigh the evidence or assess the credibility of the witnesses,” and consider only whether “there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt.” Treadway v. State, 924 N.E.2d 621, 639 (Ind.2010) (emphasis added). That is, we do not independently determine whether that heightened standard is met, as we would under the “constitutional harmless error standard,” which requires the reviewing court itself to “be sufficiently confident to declare the error harmless beyond a reasonable doubt.” Harden v. State, 576 N.E.2d 590, 593 (Ind.1991) (citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). Our review must “give ‘due regard’ to the trial court’s opportunity to judge the credibility of the witnesses firsthand,” and “not set aside [its] findings or judgment unless clearly erroneous.” K.T.K., 989 N.E.2d at 1229 (citing Ind. Trial Rule 52(A)).
Discussion and Decision
Father challenges the sufficiency of the evidence to support terminating his parental rights, arguing that DCS failed to prove every necessary element of its case by “clear and convincing evidence.” So far as relevant here, DCS had to prove four elements: (1) E.M. and E1.M. “ha[d] been removed from the parent for at least six (6) months under a dispositional decree”; (2) “there is a reasonable probability that the conditions that resulted in the child[ren]’s removal or the reasons for placement outside the home of the parents will not be remedied”; (3) “termination is in the best interests of the child[ren]”; and (4) “there is a satisfactory plan for the care and treatment of the child.” I.C. § 31-35-2 — 4(b)(2) (2008). On transfer, Father’s arguments focus principally on the second and third elements — whether there is “clear and convincing evidence” of a reasonable probability that he would fail to remedy the domestic violence that led to the children’s removal, and whether terminating any relationship with their father is in the children’s best interests. We address each argument in turn.
I. Remedying Conditions Resulting in Removal.
In determining whether “the conditions that resulted in the ehild[ren]’s *643 removal ... will not be remedied,” id., we “engage in a two-step analysis,” K.T.K., 989 N.E.2d at 1231. First, we identify the conditions that led to removal; and second, we “determine whether there is a reasonable probability that those conditions will not be remedied.” Id. (quoting I.A., 934 N.E.2d at 1134) (internal quotation marks omitted). In the second step, the trial court must judge a parent’s fitness “as of the time of the termination proceeding, taking into consideration evidence of changed conditions,” Bester v. Lake Cty. Office of Family & Children, 839 N.E.2d 143, 152 (Ind.2005) — balancing a parent’s recent improvements against “habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.” K.T.K., 989 N.E.2d at 1231 (quoting Bester, 839 N.E.2d at 152) (internal quotation marks omitted). We entrust that delicate balance to the trial court, which has discretion to weigh a parent’s prior history more heavily than efforts made only shortly before termination. See K.T.K., at 1234.[2] Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents’ past behavior is the best predictor of their future behavior.
Here, the neglect and domestic violence that resulted in the children’s removal, see I.C. § 31-34-1-1(1) (2008), were so severe that E.M.’s and EhM.’s older half-siblings fled from the home to call 911 during previous incidents, and witnessing the violence had caused them to suffer post-traumatic stress disorder (PTSD). And the violence was serious enough that when police arrived to investigate the incident that triggered the CHINS case, Father hid from them on the roof of the house. Yet the violence escalated still further during the CHINS case — culminating in the admitted biting and stabbing incident in March 2009. Against that background, Father’s prior pattern of apathy toward services and hostility toward service providers is significant — as is his testimony minimizing his domestic violence as merely becoming “upset beyond necessity” or “overreacting,” and shifting the blame to unspecified people who had “attacked” him and made him “angry”:
I admit that I have gotten upset, uh, beyond the necessity for things that I, for, uh, I have felt I have been attacked on certain levels and it has made me angry, yes, and I agree, you know, that, uh, maybe I have overreacted. I think that, yeah, I’m probably guilty of it.
Tr. 190.
In view of that evidence, the trial court entered a number of specific findings of fact, which illuminate how it weighed Father’s past history against his recent efforts:
• The children were referred to DCS “due to domestic violence in the home between [M]other and [FJather.”
*644 • “Services were made available to all the parents,” including “anger management [and] domestic violence counseling. ...”
• Father “continued ... to live in the home, and the children and [Mjother were being abused in the home” until they “had to be removed in February 2009.”
• Father “denied all services offered” and “refused to comply with any of the service providers” until services for him “ceased ... due to his non-compliance and lack of contact.”
• Father “continues to deny that he has issues with domestic violence.”
• Father “has not completed any counseling or therapy.”
• “Even though [Father] has recently attempted to comply with the case plan, he has had ample opportunity before his incarceration to comply, which he refused.”
It is apparent from those findings that the trial court was unpersuaded by Father’s recent efforts — inferring instead from his past hostility toward services that he was unlikely to succeed in remedying a domestic-violence problem that he refused to even acknowledge. So viewed, the findings are sufficient to clearly and convincingly support the judgment.
The more difficult issue in this case, though, is the threshold question of whether the evidence supports those findings. The dissenting opinion would hold that four of the findings — the children being abused in the home, Father denying all services offered, Father denying his issues with domestic violence, and Father failing to complete any counseling or therapy— are “unsupported by any evidence whatsoever,” op. at 651; and that the remaining findings are “wholly insufficient to support the trial court’s judgment,” id. at 652. But even though the evidence and potential inferences were conflicting, the record sufficiently supports the trial court’s findings. We therefore respectfully disagree with our colleague.

A Father’s abuse of the children.

First, it was reasonable under the circumstances to find that Father’s violence towards Mother had also “abused” E.M. and E1.M. — the trial court was not required to believe that they were unaffected by the same violence that had caused their older half-siblings to develop PTSD. “[M]any people assume that very young children are not affected at all” by violence between their parents, “erroneously believing that they are too young to know or remember what has happened.” Joy D. Osofsky, The Effects of Exposure to Violence on Young Children, 50 Am. Psychologist 782, 783 (1995). But “even in the earliest phases of infant and toddler development, clear associations have been found between exposure to violence and post-traumatic symptoms and disorders.” Id. Indeed, “[t]he developing brain is most vulnerable to the impact of traumatic experiences” before age one — and during the first three years, those experiences actually change the organization of the brain’s neural pathways. Abigail Sterne et al., Domestic Violence and Children: A Handbook for Schools and Early Years Settings 19 (2010) (citations omitted); Allan N. Schore, The Effects of Early Relational Trauma on Right Brain Development Affect Regulation, and Infant Mental Health, 22 Infant Mental Health J. 201, 209-10 (2001).
A lack of beatings therefore does not equate to a lack of abuse, nor does the children’s tender age equate to a lack of harm. Infants as young as fifteen months exhibit behavioral disturbances from spousal violence. Charles H. Zeanah, et al, Disorganized Attachment Associated *645 with Partner Violence: a Research Note. 20 Infant Mental Health J. 77, 82-83 (1999). And for later infants and toddlers like E1.M. and E.M., the symptoms are “very similar to post-traumatic stress disorder in adults.” Joy D. Osofsky, The Impact of Violence on Children, 9 Domestic Violence & Children 33, 36 (1999) (citing Osofsky et al., The Effects of Trauma on Young Children: A Case of Two-Year-Old Twins, 76 Int’l J. Psychoanalysis 595 (1995)). But “[yjounger children generally do not have the ability to express their feelings verbally” — so their “observable reactions ... may not tally with their emotional reactions,” and “[i]t may take some time before children are able to show any reaction at all” despite being affected. Sterne et al., supra, at 20. Based on the older half-siblings’ PTSD diagnoses and the younger children’s even greater vulnerability to psychological harm, the trial court was within its discretion to find that Father’s violence against Mother had also abused E.M. and ELM.

B. Father’s denial of all services offered.

Second, the finding that Father “denied all services offered” was also proper. That finding is followed later in the same paragraph by another finding that he “recently attempted to comply with the case plan.” Reading those findings together, we find it to be clear in context that the court was referring only to Father’s pre-incarceration refusal of services — a matter he does not substantially dispute. Moreover, that refusal of services was accompanied by his failure to attend most of the CHINS hearings in the same timeframe — further illustrating what was, at least during that time, a deep-seated disregard of the children’s needs and of any attempt to remedy the abusive conditions in their home. In its proper context, we find no error in this finding.

C. Father’s continued denial of issues with domestic violence.

The trial court also had ample record basis to “fault Father for ‘con-tin[uing] to deny that he has issues with domestic violence.’” Op. at 653. Father unequivocally testified that his problem was only anger, not violence. We are not being hyperliteral — he drew that distinction in no uncertain terms:
Q Sir, you stated you overreacted, um, sometimes, in terms of having some kind of domestic disturbances with [Mother]?
A No, that’s not what I said.
Q That’s not what you said?
A No, sir.
Q That you overreacted, that you would overreact?
A She said, did I ever have any anger issues, and I said, I do believe that in instances, I have overreacted—
Q Okay.
A —to, to, to, to where, the way I have been treated, uh, to, you know, in, when, when it relates to that situation and, and I could have, I could have responded better, that’s what I said. Yes, sir.
Q So you don’t really feel like you have a violence, violent tendencies, or anything like that?
A I know I don’t have violent tendencies — in terms of committing to harming someone, no, sir.
Q All right. Well, back in 1993, you were convicted of Armed Robbery, did you, or did you not? [sic ]
A Yes, sir.[3]
*646 Father’s unequivocal denial of any issue with violence — despite his recent domestic violence and prior conviction for a violent crime — amply supports the trial court’s similarly unequivocal finding.
Nor can we agree that there is any “lack of evidence that violence in Father and Mother’s home would not be (and has not already been) remedied,” as the dissent would hold. Op. at 655. The trial court was not required to ascribe weight to the three-year lack of domestic violence between Father and Mother, when Father was incarcerated for most of that time; nor was it required to credit Father’s wife’s testimony that he had never been violent towards her. Moreover, the risk factor in abusive relationships is the abuser, not the victim. “Deprived of their victim, many abusers will go on to abuse another intimate partner or family member. ... [Approximately one-third of abusers will reabuse in the short run, and more will reabuse in the long run.” Andrew R. Klein, Nat’l Inst, of Justice, Practical Implications of Current Domestic Violence Research: For Law Enforcement, Prosecutors and Judges 18-19 (2009), available at http://www.ncjrs.gov/pdffilesl/ nij/225722.pdf. The trial court was not required to turn a blind eye to the statistical reality that an abuser — particularly one who denies having a problem — would be at higher risk of future abuse, even if his preferred victim was his girlfriend instead of his wife.

D. Father not completing any counseling or therapy.

Fourth and finally, the finding that Father “has not completed any counseling or therapy” was technically correct, albeit of limited probative value. The only evidence of Father “completing” anything like “counseling or therapy” was a “Certificate of Participation” in a “Parenting Education Program” about which Father presented no additional information, and a single sentence of Father’s own testimony: “I also completed anger management while I was incarcerated.” With no evidence about the substance of the parenting program, the trial court was not required to consider it a form of counseling or therapy; nor was it obligated to credit Father’s testimony about anger management. The remaining testimony was that Father had “one or two meetings left” for a second anger management class and had “attended” a second parenting class, and a document showing that he had attended one hour of alcohol and drug counseling (as part of a twelve-hour program) — but not that he had “completed” any of those. Given Father’s near-completion of those subsequent classes, this finding standing alone could not support termination — but since the other findings are amply supported by the evidence, any shortfall in this finding does not undermine our confidence in the judgment.
To the contrary, the four findings we have particularly scrutinized highlight important differences between this case and Rowlett v. Vanderburgh Cty. Office of Family & Children, which also involved an incarcerated father. 841 N.E.2d 615 (Ind.Ct.App.2006), trans. denied. There, children of similar ages (three and two) were removed from the home, adjudicated CHINS, and placed with their grandmoth *647 er. Id. at 617-19. The father was imprisoned while the CHINS case was pending, and the case progressed to termination about three years after the children’s removal, even though the father participated extensively in Department of Corrections programs that were appropriate to the issues (neglect and drug use) that were the basis for removal. Id. at 622. A divided panel of the Court of Appeals reversed the termination of the father’s rights because he “should have [been] granted ... a sufficient period following his release to demonstrate his willingness and ability to assume parental duties.” Id. at 619-20.
But Father here is not similarly situated to Rowlett. There, the father had expressed desire for reunification starting on the very day the children were removed, and he was active in the CHINS case. Id. at 617-18. Further, he undertook 1,100 hours of appropriate programs, and he maintained his relationship with the children by letters and phone calls from prison. Id. at 622. And critically, the father’s testimony in Rowlett showed significant insight into his drug problem that led to the children’s removal: “I never wanna use drugs again. It’s ruined my life. It’s ruined everything about me.” Id. at 622. By contrast, Father here had nearly a year before incarceration to participate in court-ordered services yet did nearly nothing, including choosing not to appear for any but the first two CHINS hearings — and he made no effort to maintain his relationship with E.M. and ELM. while in prison, or even to notify DCS that he was there. And despite the programs he participated in during and after his imprisonment, Father’s testimony showed his continuing lack of insight into the domestic violence that led to the CHINS case.
The similarities between this case and Rowlett may have permitted the trial court to find in Father’s favor — but unlike Row-lett, the evidence was not compelling enough to require it. Instead, as in K.T.K., it was not “clearly erroneous” for the trial court to find that Father’s recent accomplishments, though commendable, were nevertheless outweighed by his historical patterns and ongoing failure to appreciate the extent of his domestic violence problems. The Court of Appeals’ focus on Father’s recent efforts was understandable, but nevertheless amounted to reweighing the evidence in violation of the standard of review.
II. Termination in Children’s Best Interests.
Perhaps the most difficult determination in a TPR is whether terminating parental rights is in the children’s best interests — a question that necessarily places the children’s interest in preserving the family into conflict with their need for permanency. As Father discussed at oral argument, social science research shows significant benefits to children when non-custodial fathers remain involved in their lives. E.g., Marcia J. Carlson & Katherine A. Magnu-son, Low-Income Fathers’ Influence on Children, 635 Annals of Am. Acad. Pol. & Soc. Sci. 95, 107 (2011) (collecting studies). Consistent with those findings, federal and state child-welfare laws mandate reasonable efforts “to preserve and reunify families.” 42 U.S.C. § 671(a)(15) (2006); I.C. § 31-34-21-5.5(b) (2008). Attempting to preserve and reunify families promotes not just parents’ fundamental liberty interest in raising their own children, see Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), but also the children’s best interests. Marginal reunification efforts, then, come at the expense of children and parents alike.
But children also have a paramount need for permanency, which we have called “a central consideration in de *648 termining the child’s best interests.” K.T.K., 989 N.E.2d at 1235 (quoting G.Y., 904 N.E.2d at 1265) (substitutions omitted). Indeed, just as social science confirms the value of fathers, it also confirms the value of permanency. E.g., Thaddius A. Townsend, Going Before Solomon with a Special Request: The Need for Clearer Legal Recognition of Shared Custody Rights Between Parents and Nonbiological Parents, 41 Cap. U.L.Rev. 327, 351-52 (2013) (“Child welfare experts have recognized that legally secure permanent placement is necessary for a child’s psychological stability and sense of belonging.” (internal quotation marks omitted)). For that reason, our laws that require reasonable family-preservation efforts are balanced by mandates aimed at accomplishing speedy permanency. As an example, federal and state laws require courts to hold a child’s permanency hearing no later than 12 months after placement in foster care, 42 U.S.C. § 676(5)(C) (2006); I.C. § 31-34-21-7(a) (2008) — and as of October 1, 2013, to report annually on the median number of days to permanency in their child-welfare cases. Ind. Administrative Rule 1(F) (citing U.S. Dep’t of Health & Human Servs., Admin, for Children & Families, ACYF-CB-PI-12-02, Program Instructions for the Court Improvement Program (2012), available at http://www.acf. hhs.gov/sites/default/files/cb/pil202.pdf). Simply stated, children cannot wait indefinitely for them parents to work toward preservation or reunification — and courts “need not wait until the child is irreversibly harmed such that the child’s physical, mental and social development is permanently impaired before terminating the parent-child relationship.” K.T.K., 989 N.E.2d at 1235 (internal quotation marks omitted).
So while permanency is important in every TPR case, it was particularly urgent here — as reflected in the trial court’s pointed finding that “[t]he children cannot wait three years for a parent to comply” with services. It was undisputed that at the time of the hearing, the children had been removed from the home for nearly three and a half years — since E.M. was barely a year old and E1.M. was in early infancy. And they had lived and bonded with their grandmother R.E. for nearly a year and a half, while having never bonded with Father. Yet as the Court of Appeals observed, Father was still not “ready to parent E.M. and E1.M., who currently do not know their father,” and would likely need “additional services” in regard to parenting, domestic violence, and anger management. Op. at 647.
The final question, then — and the one central to this Court’s difference of opinion — is whether Father’s efforts after his release from prison necessarily made the children’s interest in family preservation more compelling than their need for permanency after three years. We agree fully with the dissent that focusing on permanency, standing alone, would imper-missibly invert the best-interests inquiry; and we must sadly concur that preservation efforts have too often been extended halfheartedly to non-custodial minority fathers. As both opinions’ reliance on psychological and sociological research illustrates, child-welfare cases often implicate delicate social questions — and just as we have presumed the trial court’s familiarity with research about the effects of domestic violence on children in the household, we expect our child-welfare courts to be equally mindful of the dissent’s crucial concerns. Terminating a fit parent’s relationship with his children fails to advance the State’s parens patriae interest, and gravely and irreparably harms families. That harm would be greater still if it *649 were, even unconsciously, the product of racial bias.
But we perceive no such distortion in this particular case. Children’s vital interests in both preservation and permanency are inherently at odds in TPR cases — all the more so in this case, for the policy reasons the dissent thoughtfully identifies. And while the evidence in TPR cases is often lopsided, it was a much closer call here, because Father’s efforts to form a relationship with his children appear entirely genuine and demonstrate significant progress from his hostility toward services and service providers at the beginning of the case. Yet it was not unreasonable for the trial court to find the countervailing evidence even more compelling — that the children had waited nearly three and a half years to have a permanent home, that Father was still in no position to provide them with that home, that he had not even bonded with them, and that his failure to make progress in regard to his domestic violence did not bode well for his ability to do so in any reasonable amount of additional time.
We recognize that Father’s incarceration played a substantial role in the lengthy delay and his failure to bond with the children — but incarceration alone cannot justify “tolling” a child-welfare case, as Father essentially seeks to do. First, Father cannot contend that those problems were merely a byproduct of imprisonment, when he had had nearly a year before then to engage in services and bond with his children, but failed to do so. And even after his apparent change of heart in prison, he could have notified DCS of his imprisonment, requested services, or at least sent progress reports from his prison programs. For that matter, he could have made at least some effort to communicate with E.M. and El.M., perhaps by sending cards or short letters, or by telephone as they became older — all of which Rowlett illustrates are viable from behind bars, even with children as young as two or three years old.
Still, we acknowledge that for all the reasons the dissent identifies, the evidence here was close, and Father’s admirable efforts after his release from prison could have permitted a denial of TPR. Unlike Rowlett, though, the evidence does not compel denial, either — as it might if this case involved a shorter delay, some efforts by Father to forge a relationship with his children from prison, or greater insight into his domestic violence problem. Because the trial court could reasonably have reached either conclusion, our deferential standard of review is dispositive. It was not clearly erroneous for the trial court to conclude that after three and a half years, Father’s efforts simply came too late, and that E.M. and El.M. needed permanency even more than they needed a final effort at family preservation.
Conclusion
We recognize the great value of encouraging noncustodial fathers to be involved in their children’s lives. Similarly, we acknowledge the efforts Father made toward that goal after his release from prison, in sharp contrast to his earlier hostility toward services. Yet despite his efforts, there were strong indications that he still had not come to terms with the domestic violence that triggered DOS’s involvement. The children’s best interests — especially their need for permanency after years in “temporary” placement — are paramount. After hearing the extensive testimony and reviewing voluminous exhibits, the trial court was within its discretion to find the children’s needs to be weightier than Father’s belated efforts. Because we may not reweigh that evidence, we affirm the trial court.
DICKSON, C.J., and DAVID and MASSA, JJ., concur.
*650 RUCKER, J., dissents with separate opinion.

. Father and both children share the initials E.M. To distinguish them, we refer to Father as "Father,” to the older child as "E.M.,” and the younger child as “ELM.” The other children are not Father's and are not involved in this appeal.

. Accord In re W.B., 772 N.E.2d 522, 534 (Ind.Ct.App.2002) ("[T]he trial court did consider the Parents' improved circumstances, but found the short-term improvements insufficient to outweigh the Parents’ habitual patterns of conduct. We find no fault with this conclusion.”); In re C.M., 675 N.E.2d 1134, 1140 (Ind.Ct.App.1997) ("Although [Mother] argues that she had started to comply with the dispositional order shortly before the termination hearing, it was within the province of the trial court, as the finder of fact, to ignore or discredit this evidence.”). See also, e.g., In re A.J., 881 N.E.2d 706, 714-16 (Ind. Ct.App.2008), trans. denied; In re D.D., 804 N.E.2d 258, 266 (Ind.Ct.App.2004), trans. denied; In re D.G., 702 N.E.2d 777, 779 (Ind.Ct. App.1998) (all stating that while parental fitness should be judged as of the date of the termination proceedings, trial court must also consider the parent's historical patterns of conduct in determining the probability of future neglect, deprivation, or other detrimental behavior).

. In view of this evidence, the dissent is correct that finding Father’s recent imprison *646 ment was for armed robbery was clearly erroneous. Instead, it was for a felony weapons possession charge. But it is the fact of imprisonment, not the nature of the underlying offense, that is most relevant to this case. Moreover, even a relatively old conviction for a violent offense like armed robbery is relevant in view of Father's recent domestic violence history. Conflating Father’s old conviction with his recent imprisonment was error, but does not warrant reversal.