

IN THE

# Court of Appeals of Indiana

In re the Involuntary Termination of the Parent-Child Relationship of:

T.S. (Minor Child)

and

J.V. (Mother),

*Appellant-Respondent*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*



FILED

Aug 01 2025, 9:04 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

August 1, 2025

Court of Appeals Case No.
25A-JT-137

Appeal from the Hancock Circuit Court

The Honorable Cody B. Coombs, Magistrate

Trial Court Cause No.
30C01-2403-JT-000086

**Opinion by Judge Felix**

Judges Vaidik and Tavitas concur.

**Felix, Judge.**

## Statement of the Case

T.S. ("Child") is the biological child of J.V. ("Mother") and C.S. ("Father").[1] After two child in need of services ("CHINS") adjudications and nearly six years of Mother making insufficient progress toward dispositional goals, Mother's parental rights to Child were terminated. Mother now appeals that termination and presents three issues for our review:

1. Whether the trial court violated Mother's due process rights;
2. Whether the trial court's decision to terminate Mother's parental rights was clearly erroneous; and
3. Whether Mother's trial counsel was ineffective.

We affirm.

## Facts and Procedural History

Child was born on August 6, 2010. In 2016, Child was alleged to be and adjudicated a CHINS due to Mother's incarceration.[2] By late August 2017, Child and Mother were reunified.

---

[1] Father does not participate in this appeal.

[2] The trial court in this case took judicial notice of the 2016 CHINS case.

[4] In August 2018, DCS again removed Child from Mother's care and filed a petition alleging Child was a CHINS, this time because of Mother's drug use and Mother's neglect of Child's needs and education. In the ensuing dispositional order, Mother was ordered in relevant part to (1) maintain contact with DCS; (2) allow DCS or other service providers to make announced or unannounced visits to her home and permit entrance thereto; (3) maintain suitable, safe, and stable housing, including maintaining functional utilities and keeping the home sanitary, clean, free from clutter, and safe for Child; (4) secure and maintain stable income; (5) refrain from using and consuming illegal substances and alcohol; (6) submit to random drug screens; (7) complete a substance abuse assessment and successfully complete all recommendations stemming therefrom; and (8) complete a psychological evaluation assessment and successfully complete all recommendations stemming therefrom.

[5] By August 2020, Mother had—at best—only partially complied with the dispositional order.

> Mother has had inconsistent communication with DCS and been noncompliant with drug screens. She was closed out of substance abuse treatment and home based casework unsuccessfully. When tested at a visitation on June 4, she tested positive for methamphetamines. She is believed to be subject to an arrest warrant for violation of her probation.

Tr. Vol. III at 83. Consequently, Child's permanency plan was changed to reunification with a concurrent plan of adoption.

[6]     Mother's pattern of minimally complying with the dispositional order continued for another three-and-a-half years. In particular, for more than a year, Mother failed to successfully complete substance abuse treatment, continued to test positive for illegal substances, and did not consistently engage in drug screens. Mother did eventually achieve sobriety. However, Mother still maintained only "minimal" contact with DCS, Tr. Vol. III at 86, 129; refused to participate in mental health services; participated in "approximately 75% of her visitation [with Child], cancelling on average once a month," after she was released from jail, *id.* at 97; "refused to make herself available" for a home inspection, *id.* at 98; failed to provide DCS an "accurate address," *id.* at 129; and failed to maintain suitable housing, with her Hancock County home not having electricity and being set for tax sale at one point. Additionally, in June 2022, the Hancock County Board of Health filed a complaint for a permanent injunction against Mother to bring her property into compliance with Hancock County's sanitation maintenance ordinance.[3] The case was resolved within two months.

[7]     On March 6, 2024, DCS filed a petition to terminate Mother's parental rights to Child. The trial court held the factfinding hearing on DCS's termination petition on four separate days: May 29, August 21, September 25, and October 2, 2024. At the end of the hearing on October 2, the trial court took the matter

---

[3] The trial court in this case took judicial notice of the 2022 sanitation case.

under advisement. On February 14, 2025, the trial court issued its order terminating Mother's parental rights to Child. This appeal ensued.[4]

## Discussion and Decision

### 1. The Trial Court Did Not Violate Mother's Due Process Rights

Mother contends the trial court violated her due process rights by not issuing its termination order until 135 days after the final day of the factfinding hearing. Mother's fundamental (but not absolute) right to raise Child is protected by the Fourteenth Amendment to the United States Constitution. *See In re I.P.*, 5 N.E.3d 750, 751–52 (Ind. 2014) (citing *Bester v. Lake Cnty. Off. Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005)). "[W]hen the State seeks to terminate the parent-child relationship, it must do so in a manner that meets due process requirements." *Id.* (citing *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011)). Appellate courts balance three factors to determine the process due in a termination case: "(1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure." *Id.* (citing *C.G.*, 954 N.E.2d at 917).

"Both a parent's interest in the care, custody, and control of a child, and the State's *parens patriae* interest in protecting a child's welfare are substantial."

---

[4] Mother actually filed a notice of appeal before the trial court entered the termination order, but once that order was issued, Mother amended her notice of appeal.

*I.P.*, 5 N.E.3d at 752 (emphasis in original) (citing *C.G.*, 954 N.E.2d at 917). At issue here is whether the trial court's delay in issuing the termination order created a risk of error such that a due process violation occurred.

[10] First, Mother argues that the trial court's delay in issuing the termination order violated her due process rights because termination of parental rights cases should "proceed expeditiously," as demonstrated by the deadlines imposed by Indiana Code section 31-35-2-6 and the priority given to termination of parental rights cases under Indiana Appellate Rule 21(A). Appellant's Br. at 18. Mother recognizes that Indiana law "does not have a time limit on how long a court may take termination under advisement," but nevertheless points to Indiana Trial Rule 53.2 to say that the trial court should have issued its termination decision within 90 days. *Id.* at 19. Trial Rule 53.2 provides in relevant part that when a trial court takes a matter under advisement and fails to "determine any issue of law or fact within ninety (90) days, the submission of the pending issues and the cause *may* be withdrawn from the trial judge and transferred to the Supreme Court for the appointment of a special judge. Ind. Trial Rule 53.2(A) (emphasis added). Trial Rule 53.1 sets out the specific procedure a party must follow to have a cause withdrawn from a trial judge. *Id.* 53.1(E); *see id.* 53.2(E) ("The procedure for withdrawing submission and processing the appointment of a special judge shall be as set forth in Trial Rule 53.1(E)."). Notably, the party who seeks relief pursuant to Trial Rule 53.2(A) must file a praecipe specifically designating the motion or decision delayed. *Id.* 53.1(E). It is undisputed that Mother did not file the requisite praecipe here.

[11] Second, Mother argues that a delay in issuing a termination order results in the evidence no longer being "fresh on the trial judge's mind" and "stalls a parent's right to a [sic] appeal termination of parental rights."[5] Appellant's Br. at 19. In her reply brief, Mother elaborates on the first argument, asserting that "the risk of error created by the delay is that termination decision could be incorrect." Appellant's Reply Br. at 6. Again, Mother could have availed herself of Trial Rule 53.2 if she believed the trial court's decision could be incorrect due to delay; she did not, so she cannot now complain about an issue she failed to raise to the trial court. As to her second argument regarding her appeal rights, Mother does not claim that her right to appeal the trial court's termination order was stalled; in fact, Mother filed a notice of appeal before the trial court issued its termination order and then amended that notice shortly after the trial court entered its order.

[12] A judge who issues a decision beyond the time limits set forth in Trial Rule 53.2 risks being removed from the case and causing the entire matter to be retried; therefore, these time limits should be observed. But Mother failed to avail herself of Trial Rule 53.2 and has failed to demonstrate on appeal that the risk

---

[5] Mother also argues that "the delay caused by holding the case under advisement prejudice [sic] [Mother]'s relationship with [Child] and [Child]'s interest in permanency," Appellant's Br. at 19, but she does not elaborate on this statement or otherwise identify any specific prejudice she suffered. In fact, in her reply brief, Mother concedes that "[t]he risk of error created by this delay was not that Mother would see the child more or less while the termination was pending. Rather, the risk of error created by the delay is that termination decision could be incorrect." Appellant's Reply Br. at 6.

of error created by the trial court's delay outweighs DCS's interest in protecting Child.

[13] Based on the foregoing, we cannot say there was a due process violation because Mother raised the issue for the first time on appeal and because she could have sought but failed to seek trial-level relief from any such violation. Here, the underlying CHINS case lasted six years, the termination factfinding hearing took four months to complete, and the trial court issued its termination decision 45 days beyond the recommended timeline[6] to decide the issue. The trial court's 45-day delay in issuing its termination decision did not violate Mother's due process rights.

## 2. The Trial Court's Decision to Terminate Mother's Parental Rights to Child Was Not Clearly Erroneous

[14] Mother challenges the trial court's termination of her parental rights over Child. "Parents have a fundamental right to raise their children—but this right is not absolute. When parents are unwilling to meet their parental responsibilities, their parental rights may be terminated." *In re Ma.H.*, 134 N.E.3d 41, 45–46 (Ind. 2019) (internal citations omitted) (citing *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013)), *cert. denied*.

---

[6] Additionally, the trial judge could (should) have applied for an extension of time to decide the case under Trial Rule 53.1(D). We note that a recent proposed change to TR 53.1(D) (proposed June 2025) would have allowed the judge to grant himself additional time to decide the matter.

To terminate Mother's parental rights, DCS had to prove by clear and convincing evidence, that, among other things, there is a reasonable probability that the conditions that resulted in Child's removal or the reasons for placement outside Mother's home will not be remedied, there is a reasonable probability that the continuation of Mother's relationship with Child poses a threat to the well-being of Child, or Child has, on two separate occasions, been adjudicated a child in need of services; termination is in the best interests of Child; and there is a satisfactory plan for the care and treatment of Child. *See* Ind. Code § 31-35-2-4(b)(2) (effective July 1, 2019, to March 10, 2024); *id.* § 31-37-14-2.

We will affirm a trial court's termination of parental rights unless that decision is clearly erroneous. *Ma.H.*, 134 N.E.3d at 45 (citing *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014)). A trial court's termination decision is clearly erroneous if the court's findings of fact do not support its legal conclusions or if the legal conclusions do not support its ultimate decision. *Id.* (citing *E.M.*, 4 N.E.3d at 642). We will not reweigh the evidence or judge witness credibility, and we consider only the evidence and reasonable inferences that support the court's decision. *Id.* (citing *In re K.E.*, 39 N.E.3d 641, 646 (Ind. 2015)).

Furthermore, we accept as true any findings that Mother does not challenge on appeal. *See R.M. v. Ind. Dep't of Child Servs.*, 203 N.E.3d 559, 564 (Ind. Ct. App. 2023) (citing *Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992)), *trans. not sought*. Here, Mother does not challenge the following relevant findings:

> 45. . . . Mother has not shown an ability to adequately care for the child despite the case being open for over 6 years. Mother's

visits have never progressed past pop-in level supervision and Mother's home is currently uninhabitable per Court injunction. Based on Mother's current situation it is not apparent she can care for the child's high-level of needs.

46. . . . Mother denies neglecting the child in the CHINS case thus showing her unwillingness to address the issues affecting her parenting.

47. . . . Mother knew of the Department[']s concerns and waited until the day before the final termination hearing to address the concerns of the exterior of the home. Mother did not maintain communication with the Department and failed to follow the dispositional decree.

 * * *

49. . . . Mother has demonstrated an inability to parent the child when she routinely missed visitation and has failed to demonstrate her understanding of the child's developmental issues and how they relate to concerns of home conditions. Mother's actions during the life the case do not demonstrate her ability to satisfy the child's need for routine and consistency which would lead to regression and unsafe behaviors. The child is also a danger to himself if left alone with dangerous items. In pictures presented by the Department[,] Mother had knives and machetes setting in her lawn unsecured. The condition of the interior of the home is additionally concerning[,] especially since Mother has not allowed anyone from the Department into the home for some time. Mother's testimony was disjointed, unclear, and flippant at times. Her testimony elicited concerns for her underlying mental health and concerns for her ability to recognize the reasons for continued DCS involvement.

50. . . . Mother has not demonstrated stability in her life or the child's life. Mother reported she had been working on her home since 2022 but, as of the termination proceeding, the home is currently uninhabitable per court order. Mother does not have stable employment, phone service, or transportation. In the 6 years since the case has been open[,] Mother has only had one suitable residence for the child for approximately 3 months but decided to leave under her own volition and return to her current home.

51. . . . The child has been in DCS care for over 6 years. In that time frame Mother has been unable to demonstrate any stability to the court that would indicate her ability to safely care for the child. The child is in a relative placement that is able and willing to adopt the child.

Appellant's App. Vol. II at 21–22.

[18] Mother contends the trial court clearly erred by concluding that there was not a reasonable probability that she would remediate the reasons for Child's removal or placement outside her care, the continuation of the parent-child relationship poses a threat to Child's well-being, termination of Mother's parental rights is in Child's best interests, and there is a satisfactory plan for Child's care. We address each contention in turn.

### *Remediation of Reasons for Removal or Placement*

[19] Mother first challenges the trial court's conclusion that there is a reasonable probability that the conditions resulting in Child's removal or the reasons for placement outside Mother's home will not be remedied. In reviewing the trial court's findings regarding whether Mother has or will remedy the conditions

resulting in Child's removal from Mother or the reasons the Child was placed outside Mother's home, we first "identify the conditions that led to removal" and then "determine whether there is a reasonable probability that those conditions will not be remedied." *In re J.S.*, 133 N.E.3d 707, 715 (Ind. Ct. App. 2019) (citing *E.M.*, 4 N.E.3d at 643).

> In the second step, the trial court must judge parental fitness as of the time of the termination hearing, taking into consideration the evidence of changed conditions. The trial court is entrusted with balancing a parent's recent improvements against habitual patterns of conduct. The trial court has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior.

*J.S.*, 133 N.E.3d at 715 (internal quotation marks and citations omitted) (quoting and citing *E.M.*, 4 N.E.3d at 643). Additionally, we do "not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, 'but also those bases resulting in the continued placement outside the home.'" *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013) (quoting *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*).

[20] Child was removed from Mother's care in 2018 because Mother was abusing illegal substances and she was neglecting Child's needs and education. Mother argues that she "had successfully address[ed] her substance abuse problem,"

Appellant's Br. at 22, and DCS concedes that Mother "had achieved sobriety," Appellee's Br. at 18.  Mother also argues that she had "made significant progress towards having suitable housing and was on the cusp of being able to return to her home at the last fact-finding hearing."  Appellant's Br. at 23.  This argument is merely an invitation for us to reweigh the evidence and reassess witness credibility, which we cannot do.  *See Ma.H.*, 134 N.E.3d at 45 (citing *E.M.*, 4 N.E.3d at 642).  Mother testified at the October 2 factfinding hearing that the Hancock County Board of Health had obtained an injunction against her that prevented her from living in her home.  Mother stated that she would be able to return to the home once she "cleaned up" her yard and had the electricity turned on.  Tr. Vol. II at 126.  Mother also testified that she did not have running water as of the October 2 hearing.  Moreover, the trial court's unchallenged findings show that Mother "waited until the day before the final termination hearing to address the concerns of the exterior of the home," Appellant's App. Vol. II at 21, and had yet to allow DCS to inspect the interior of her home.  The unchallenged findings also establish that during the six years the underlying CHINS case was pending, "Mother has been unable to demonstrate . . . her ability to safely care for the child."  *Id.* at 22.  Considering only the evidence and reasonable inferences that support the trial court's decision, including the unchallenged findings, we cannot say that the trial court

clearly erred in concluding that Mother has not and likely will not remedy the reasons for the Child's removal or placement outside of Mother's care.[7]

### *Best Interests of Child*

[21] Mother also challenges the trial court's conclusion that termination of her parental rights over Child is in Child's best interests. To determine the best interests of a child, a trial court looks at the totality of the evidence and subordinates the interests of the parents to those of the child. *In re P.B.*, 199 N.E.3d 790, 799 (Ind. Ct. App. 2022) (citing *In re A.B.*, 887 N.E.2d 158, 167–68 (Ind. Ct. App. 2008)), *reh'g denied* (Jan. 25, 2023), *trans. denied sub nom. A.B. v. Ind. Dep't of Child Servs.*, 209 N.E.3d 1168 (Ind. 2023). A central consideration in this determination is the child's need for permanency. *Id.* (citing *In re K.T.K.*, 989 N.E.2d 1225, 1235 (Ind. 2013)). The trial court also considers whether a child's emotional and physical development is threatened by the parent-child relationship. *Id.* (citing *K.T.K.*, 989 N.E.2d at 1235). Permanent impairment of physical, mental, or social development is not necessary before a trial court may terminate the parent-child relationship. *Id.* (citing *K.T.K.*, 989 N.E.2d at 1235).

---

[7] Mother also argues that the trial court erred by concluding that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to Child's well-being. *See* Ind. Code § 31-35-2-4(b)(2)(B)(ii). The trial court was required to find only that one prong of Indiana Code section 31-35-2-4(b)(2)(B) has been established. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010), *trans. dismissed*. Because we agree with the trial court's conclusion that DCS proved there was a reasonable probability that the conditions which resulted in Child's removal from Mother's care would not be remedied, we need not address her argument directed at the "threat" prong of Section 4(b)(2)(B). *See id.*

Mother argues she "maintained a consistent and positive relationship with T.S.," Appellant's Br. at 25, and she "has been a permanent part of T.S.'s life for fourteen years," *id.* at 26. This is yet another request for us to reweigh the evidence and reassess witness credibility, which we cannot do, *see Ma.H.*, 134 N.E.3d at 45 (citing *E.M.*, 4 N.E.3d at 642). The unchallenged findings show that Mother is incapable of safely parenting Child: "she routinely missed visitation"; she "failed to demonstrate her understanding of the child's developmental issues and how they relate to concerns of home conditions"; Child is "a danger to himself if left alone with dangerous items," yet Mother had "knives and machetes" in her yard; Mother's residence was uninhabitable; and Mother did not have stable employment, phone service, or transportation. Appellant's App. Vol. II at 22. The unchallenged findings also demonstrate that Mother's near-complete lack of stability would result in Child regressing and engaging in "unsafe behaviors." *Id.* Considering only the evidence and reasonable inferences that support the trial court's decision, we cannot say that the trial court clearly erred in concluding that termination is in Child's best interests, so the trial court did not clearly err in reaching this conclusion.

### Satisfactory Plan

Finally, Mother challenges the trial court's conclusion that adoption is a satisfactory plan for the care and treatment of Child. This court has previously determined that "adoption is a 'satisfactory plan' for the care and treatment of a child." *In re B.M.*, 913 N.E.2d 1283 (Ind. Ct. App. 2009) (citing *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997)).

Mother specifically argues that "there was scarce evidence about DCS's proposed plan of care for T.S." and that the plan "was speculative at best." Appellant's Br. at 26. First, DCS's plan does not need to "be detailed, so long as it offers a *general sense* of the direction in which the child will be going after the parent-child relationship is terminated." *In re C.D.*, 141 N.E.3d 845, 854 (Ind. Ct. App. 2020) (emphasis added) (citing *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied*), *trans. denied*. Second, to the extent Mother's argument assumes that the plan the trial court approved is for Child's current placement to adopt him, the trial court made no such finding, conclusion, or order. Furthermore, the appropriateness of a particular adoptive placement is within the purview of the adoption court, not the termination court. *See In re C.D.*, 141 N.E.3d 845, 856 (Ind. Ct. App. 2020) (citing *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied*), *trans. denied*. Considering only the evidence and reasonable inferences that support the trial court's decision, we cannot say that the trial court's conclusion that DCS has a satisfactory plan for Child—that is, adoption—is clearly erroneous.

### 3. Mother's Trial Counsel Did Not Provide Ineffective Assistance of Counsel

Mother also contends that she did not receive effective assistance of counsel during the termination proceedings. In Indiana, all parents have a statutory right to the assistance of counsel in termination of parental rights proceedings. I.C. §§ 31-32-4-1, 31-32-2-5. When a parent challenges her counsel's effectiveness during such proceedings, we focus on "whether it appears that the

parent[] received a fundamentally fair trial whose facts demonstrate an accurate determination." *Baker v. Marion Cnty. Off. of Fam. & Child.*, 810 N.E.2d 1035, 1041 (Ind. 2004). That is, we must determine "whether the lawyer's overall performance was so defective that [we] cannot say with confidence that the conditions leading to the removal of the child[] from parental care are unlikely to be remedied and that termination is in the child's best interest." *Id.* We do not ask "whether the lawyer might have objected to this or that." *Id.*

[26] Mother argues that the attorney who represented her during the termination proceedings ("Counsel") was ineffective because he (1) made known to the trial court his and Mother's prickly attorney-client relationship, (2) failed to call two witnesses at the factfinding hearing, (3) offered but failed to have admitted into evidence a letter from one of those two witnesses, (4) had the factfinding hearing continued because he had not reviewed photos that Mother provided him, and (5) did not file a Trial Rule 53.2 motion when the trial court did not issue the termination order within 90 days of the October 2 hearing. According to Mother, because Counsel "did not present [Mother's] evidence and showed the Court an acrimonious relationship with [Mother], 'the trial court may not have an accurate picture of the evidence.'" Appellant's Br. at 28 (quoting *In re D.A.*, 869 N.E.2d 501, 511 (Ind. Ct. App. 2007)).

[27] First, at the beginning of the May 29 hearing, all parties were present except Mother. When discussing whether they should wait for Mother, the following exchange occurred:

THE COURT:  Do you have any objection to proceeding
[Counsel]?

[DCS]:  If he wants to try to wait and give her 15 minutes 20
minutes that's fine.

[COUNSEL]:  Yeah I m[e]an I hate to do it but either way it is –
is just a it's a mess to me.  She doesn't uh communicate with me
uh she doesn't particular[ly] like me.  Uh but uh –

Tr. Vol. II at 13–14.  Then while Counsel was cross-examining Mother about
the state of her house, the following exchange occurred:

Q  [Y]ou had a series of events happen to you that kept you from
getting things done that you wanted done.  Can you describe to
the Court what those were?

A  Oh my gosh.

Q  Get them straight.

A  (inaudible)  Uh I should have wrote that down.

Q  Well let me – let me – let me just say this?

A  Okay.

Q  [Y]ours and my relationship is not good?

A  It's terrible yeah.

Q  Yeah.  You haven't listed [sic] to a thing I've said have you?

A You don't listen either.

Q I've heard you real well but you don't – you don't listen to a thing that I say. At any rate we've discussed this issue right?

A Yeah.

Tr. Vol. II at 146–47.

[28] The effect, if any, that these exchanges had on the trial court's opinion of Mother was likely infinitesimal given the six years of evidence in the CHINS case and the evidence presented at the termination factfinding hearing. And contrary to Mother's assertion on appeal, there is nothing in the record to indicate these exchanges "may have contributed to [the] trial court's findings, for example, that '[h]er testimony elicited concerns for her underlying mental health.'" Appellant's Br. at 27 (quoting Appellant's App. Vol. II at 22).

[29] Second, Mother alleges that Counsel did not call "two witnesses" who she "wanted to call" during the factfinding hearing. Appellant's Br. at 27 (citing Tr. Vol. II at 143–44). Mother does not expressly identify those witnesses, but based on her supporting citation to the Transcript, they were Katrina Hagerman and Kelly Price. Mother claims Counsel "should have, but did not, used a subpoena to secure those witnesses' appearance at trial." *Id.* Notably, Mother does not describe the testimony she expected Hagerman and Price to give on her behalf, nor does she acknowledge that Hagerman actually did testify during the factfinding hearing; in fact, when Mother cross-examined Hagerman,

Hagerman testified that Mother had made progress in the CHINS case, Mother and Child had a loving relationship, and Mother supervised Child well.

[30] Third, Mother asserts that Counsel was ineffective for not having "a written letter from one witness" admitted into evidence. Appellant's Br. at 27 (citing Tr. Vol. II at 143–44). It is unclear which "written letter" Mother references because Mother's citation to the record reveals that Counsel offered two letters, both of which were excluded from evidence as hearsay. Mother also does not describe the contents of these letters nor how their exclusion from evidence prevented her from receiving a fundamentally fair factfinding hearing.

[31] Fourth, Mother contends Counsel was ineffective because he did not review photographs that she "provided him to defend her case," resulting in the factfinding hearing being continued. Appellant's Br. at 27 (citing Tr. Vol. II at 99–100). At the beginning of the September 25 hearing, Mother informed the trial court of her displeasure with Counsel's representation:

> [S]o my lawyer has not sent me has not read any of my messages or got any of [sic] pictures or looked at any of my stuff and he has not brought any of my evidence with me today. And he's very uncom incompetent and it's not going to help my case at all right now.

Tr. Vol. II at 99–100. After the trial court spoke with DCS and Counsel off the record, the trial court told Mother that it would schedule another hearing so she would "have the opportunity to present the things [she] provided to [Counsel] okay." *Id.* at 100. The trial court also explained to Mother that Counsel "may

not agree that they're going to be helpful," *id.*, but that Counsel would "look at the photos and kind of determine whether they're going to be helpful or not," *id.* at 101. Counsel stated on the record that "the two pictures that were sent this morning might be helpful." *Id.* at 100. Mother does not explain how the additional hearing scheduled specifically to ensure she was able to introduce all her evidence prevented her from receiving a fundamentally fair factfinding hearing. Notably, the extra hearing was held on October 2, just a week later.

[32] Fifth, Mother alleges Counsel was ineffective because he did not file a Trial Rule 53.2 motion after the trial court failed to issue an order on the termination factfinding hearing within 90 days. While Counsel certainly could have filed such a motion, there is no indication that not doing so in any way prejudiced Mother or otherwise rendered the termination proceedings fundamentally unfair. In fact, had Counsel filed a Trial Rule 53.2 motion, that could have delayed the termination decision by much longer because the factfinding hearing may have had to be redone in front of a new judge. Mother cannot in one breath complain that Counsel was ineffective for delaying the end of the factfinding hearing by one week and then in the next breath complain that Counsel was ineffective for not delaying the ultimate termination decision by months.

[33] Based on the foregoing, Mother has not shown that Counsel's overall performance was defective. Therefore, we cannot say that Mother received a fundamentally unfair factfinding hearing, and Mother's contentions do not demonstrate the trial court made an inaccurate determination.

## Conclusion

In sum, the trial court did not violate Mother's due process rights by issuing the termination order 135 days after the final part of the factfinding hearing, the trial court did not clearly err by terminating Mother's parental rights to Child, and Counsel was not ineffective. We therefore affirm the trial court on all issues raised.

Affirmed.

Vaidik, J., and Tavitas, J., concur.

ATTORNEY FOR APPELLANT

Kathrine D. Jack
Jack Law Office LLC
Greenfield, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana