## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 29 2016, 8:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Julia Blackwell Gelinas
Thomas W. Farlow
Jenai M. Brackett
Frost Brown Todd LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of L.S. (Minor Child), a Child in Need of Services,

D.S.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

September 29, 2016

Court of Appeals Case No. 49A05-1603-JC-491

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

Trial Court Cause No. 49D09-1505-JC-1608

**Najam, Judge.**

## Statement of the Case

[1] D.S. ("Father") appeals the juvenile court's order finding his daughter L.S. ("Child") to be a child in need of services ("CHINS"). Father presents two issues for our review, which we consolidate and restate as whether the evidence is sufficient to support the CHINS adjudication.

[2] We affirm.

## Facts and Procedural History

[3] Father and P.S. ("Mother") married in November 2007, and Child was born in June 2008. On April 28, 2015, the Indiana Department of Child Services ("DCS") received a report that, on April 26, Father had "punched [Mother] in the face" while Mother was holding Child and had attempted to prevent Mother from calling police. Resp't Ex. A. Father was arrested for, among other things, domestic battery and battery in the presence of a child, and Mother obtained a No Contact Order against Father.[1] Accordingly, Father moved out of the family home.

[4] On May 13, DCS filed a petition alleging that Child was a CHINS. During a factfinding hearing held over the course of three days in August and September,

---

[1] Initially, that order prohibited Father from contact with both Mother and Child, but Father was subsequently granted supervised visitation with Child.

Father and Mother testified that they were not living together and planned to dissolve the marriage. Child was living with Mother and had frequent supervised visitation with Father. By all accounts, Child was happy, thriving, and doing very well in school. And, while Child had not been diagnosed with any particular psychological disorder, Mother testified that, in her opinion, Child was suffering from anxiety. Accordingly, Child was seeing a therapist on a regular basis. At the conclusion of that hearing, the juvenile court issued the following findings and conclusions in support of its determination that Child was a CHINS:

> 3. On or about April 25, 2015[,] and April 26, 2015, Mother and [Child] returned to the marital residence located at 4460 Sylvan Road, Indianapolis, Indiana, shortly after midnight. They were returning from a birthday party, which Father had attended separately and from which he had left earlier.
>
> 4. [Child] had fallen asleep in the car on the way home, and Mother was attempting to carry her into the home in her arms. Unable to knock on the locked door, Mother kicked it and waited for Father to open the door. When Father did not come to the door, she kicked the door more loudly.
>
> 5. Father had fallen asleep and was upset that Mother and [Child] were returning so late.
>
> 6. He finally opened the door, yelled, "What the fuck?" and struck Mother on the side of her head, knocking off her hat, with [Child] still in her arms.
>
> 7. [Child] was awake at this point and observed her Father hit her mother.

8. Mother then carried [Child] to her room and put her on her bed.

9. Mother then returned to where Father was and they argued.

10. Mother took Father's cell phone and he physically attempted to take it from her. She dialed 911 to seek assistance from law enforcement and Father tried to prevent her from doing so.

11. Father was unable to prevent Mother's call to IMPD and officers responded to their home.

12. Mother's wrist was visibly bruised by Father's actions.

13. Father was arrested for Interfering with Reporting of a Crime, Domestic Battery, Battery Resulting in Bodily Injury, and Battery in the Presence of a Child and was charged with same under cause number 49G16-1504-F6-014416, which charges remained pending at the time of fact-finding.

14. Initially, the criminal court issued a No Contact Order preventing Father from having contact with Mother and [Child]; however, this was later modified to permit Father to have supervised parenting with [Child].

15. This incident of domestic violence between Mother and Father in [sic] was not the first to occur in the presence of [Child]. Previously, Father had thrown a plastic garbage can lid at Mother which struck her in head. In another incident Father threw water on Mother and [Child].

16. Because of a domestic violence incident in 2012, where Father injured Mother, Mother's L4 and L5 discs were damaged and she had to undergo 2 years of treatment.

17. Father was also verbally abusive to Mother, calling her "fat" and "ugly."

18. In March, 2015, Father kicked Mother in the back, causing her pain.

19. [Child] stated that it makes her mad when her parents argue and physically fight.

20. She has clearly been affected by the violence she has seen between her parents. She reported that it [sic] her father didn't know who she and her mother were when he struck her mother in the head that night in April, 2015. The Court finds that this is young [Child]'s way of trying to reconcile in her mind seeing her father whom she loves, hitting her mother who she also loves.

21. [Child] demonstrates anxiety symptoms such as picking at her nails and saying her stomach hurts.

22. [Child] demonstrates protective, mothering behavior toward her mother. In the presence of FCM Licorish-Holly, [Child] told her mother "we're not doing this right now" when her mother started to cry and then wiped away her tear.

23. Father seems to believe that [Child]'s current anxiety can be explained by her parents' separation and that because he and his family surround [Child] with love and support, attend to her every need, that she has been unaffected by the violence she has seen her father visit upon her mother on multiple occasions.

24. As found in *In Re: The Termination of the Parent-Child Relationship of E.M. and El.M.*, 4 N.E.3d 636, 644 (Ind. 2014), "Father's violence towards (sic) Mother had also [']abused['] E.M. and El.M. . . .[']" "[M]any people assume that very young children are not affected at all" by violence between their parents, "erroneously believing that they are too young to know or remember what has happened." Joy D. Osofsky, *The Effects of Exposure to Violence on Young Children*, 50 Am. Psychologist 782, 783 (1995). But "even in the earliest phases of infant and toddler development, clear associations have been found between

exposure to violence and post-traumatic symptoms and disorders." *Id.* Indeed, "[t]he developing brain is most vulnerable to the impact of traumatic experiences" before age one—and during the first three years, those experiences actually change the organization of the brain's neural pathways. Abigail Sterne et al., *Domestic Violence and Children: A Handbook for Schools and Early Years Settings*, 19 (2010) (citations omitted); Allan N. Schore, *The Effects of Early Relational Trauma on Right Brain Development Affect Regulation, and Infant Mental Health*, 22 Infant Mental Health J. 201, 209-10 (2001).

25. Again, as found in *In Re: The Termination of the Parent-Child Relationship of E.M. and El.M*, *supra*, "[a] lack of beatings therefore does not equate to a lack of abuse, nor does the children's tender age equate to a lack of harm. Infants as young as fifteen months exhibit behavioral disturbances from spousal violence. Charles H. Zeanah, et al, *Disorganized Attachment Associated with Partner Violence: a Research Note*, 20 Infant Mental Health J. 77, 82-83 (1999)." And for later infants and toddlers like El.M. and E.M., the symptoms are "very similar to post-traumatic stress disorder in adults." Joy D. Osofsky, *The Impact of Violence on Children*, 9 Domestic Violence & Children 33, 36 (1999) (citing Osofsky et al., *The Effects of Trauma on Young Children: A Case of Two-Year-Old Twins*, 76 Int'l J. Psychoanalysis 595 (1995)). But "[y]ounger children generally do not have the ability to express their feelings verbally"—so their "observable reactions . . . may not tally with their emotional reactions," and "[i]t may take some time before children are able to show any reaction at all" despite being affected. Sterne et al., *supra*, at 20." 3 N.E.3d at 644-5.

26. [Child]'s physical and mental condition is seriously impaired and endangered as a result of the inability, refusal or neglect of her parents to provide her with necessary shelter and supervision, as provided in Ind. Code §31-34-1-1.

27. Prior to the domestic violence incident in April, 2015, Father claimed that while under a doctor's care, [he] had become

dependent on opiate prescription pain medication. However, he had also taken some of Mother's opiate prescription pain medications. He continued his abuse of these medications until immediately after his arrest for the domestic violence which precipitated the instant action.

28. Mother had observed Father slurring his speech while abusing Vicodin.

29. Father in the months immediately preceding April, 2015 paid little attention to [Child], preferring to isolate himself from them and stay in his room or the garage most of the time.

30. Maternal grandmother Judy Stewart noted that both parents had been struggling with substance abuse and marital problems for some time, but the family did not intervene or approach them.

31. Following his arrest, Father's family did intervene with regard to his substance abuse and he entered Valle Vista Hospital for drug dependence treatment. After a week at Valle Vista, Father left. He then entered Fairbanks Hospital for seven (7) or (8) days of continued in-patient treatment. Following his discharge from Fairbanks, Father said he was recommended to complete 18 weeks of intensive outpatient drug treatment, which he stated he did. However, he offered no documentation thereof. He has had no positive drug screens.

32. Father claimed his treatment at Fairbanks included conflict resolution, anger management and triggers for substance abuse, although he offered no documentation to support these assertions.

33. Both parents smoked marijuana on occasion prior to Father's arrest in April, 2015.

34. Father was previously arrested for and convicted of possession of marijuana in Hamilton County. He was placed on probation and had to undergo substance abuse classes, but continued to smoke marijuana.

35. Father has been in [Child]'s presence while under the influence of the opiate pain medications he was abusing, as well as when he was under the influence of marijuana.

36. Caregivers who are under the influence of illegal substances or in the grips of drug dependence do not provide a child with the requisite level of supervision, nor do they provide a child with an appropriate home environment.

37. [Child]'s physical and mental condition is seriously impaired and endangered as a result of the inability, refusal or neglect of her parents to provide her with necessary shelter and supervision, as provided in Ind. Code §31-34-1-1.

38. It is clear that the coercive intervention of the court is necessary, in that Father does not believe that his violence toward Mother has affected [Child].

39. It is further clear that the coercive intervention of the court is necessary because it was not until he was arrested for domestic violence charges and forced from his home by a No Contact Order that he sought help for his opiate drug dependence.

Appellant's App. at 114-16. This appeal ensued.

# Discussion and Decision

[5] Father contends that the evidence is insufficient to support the trial court's determination that Child is a CHINS. Our supreme court has explained the

nature of a CHINS proceeding and appellate review of a CHINS determination as follows:

> A CHINS proceeding is a civil action; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.R.*, 919 N.E.2d 102, 105 (Ind. 2010). We neither reweigh the evidence nor judge the credibility of the witnesses. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. *Id.* We reverse only upon a showing that the decision of the trial court was clearly erroneous. *Id.*
>
> There are three elements DCS must prove for a juvenile court to adjudicate a child a CHINS. DCS must first prove the child is under the age of eighteen; DCS must prove one of eleven different statutory circumstances exist that would make the child a CHINS; and finally, in all cases, DCS must prove the child needs care, treatment, or rehabilitation that he or she is not receiving and that he or she is unlikely to be provided or accepted without the coercive intervention of the court. *In re N.E.*, 919 N.E.2d at 105.

*S.S. v. Ind. Dep't of Child Servs. (In re K.D.)*, 962 N.E.2d 1249, 1253-54 (Ind. 2012) (footnote omitted).

[6] Here, the juvenile court issued findings and conclusions sua sponte. Therefore, as to the issues covered by the findings, we apply the two-tiered standard of whether the evidence supports the findings, and whether the findings support the judgment. *J.B. v. Ind. Dep't of Child Servs. (In re S.D.)*, 2 N.E.3d 1283, 1287 (Ind. 2014). But we review the remaining issues under the general judgment

standard, under which a judgment will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id.*

[7] DCS alleged that Child was a CHINS pursuant to Indiana Code Section 31-34-1-1, which provides as follows:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and
>>
>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Our supreme court has interpreted this provision to require "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d at 1287.

[8] Here, Father contends that the evidence is insufficient to prove either that: (1) Child's mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the parents to supply Child with

necessary food, clothing, shelter, medical care, education, or supervision; or (2) Child needs care, treatment, or rehabilitation that is unlikely to be provided or accepted without the coercive intervention of the court. We cannot agree.

[9] In *N.L. v. Indiana Department of Child Services (In re N.E.)*, 919 N.E.2d 102, 106 (Ind. 2010), our supreme court upheld a CHINS determination where the evidence showed that the "Mother [had] failed to protect N.E. and her siblings from ongoing domestic violence between herself and the alleged father of her youngest child and . . . there had been several incidents of domestic violence against Mother in the presence of her children." Here, Father does not dispute the trial court's findings regarding the episodes of domestic violence against Mother in Child's presence. And Mother testified that Child is "definitely safer" since the CHINS proceedings began. Tr. at 61. Mother testified that Child is benefitting from therapy, but that there is still "a lot of progress to make." *Id.* at 62. Mother stated that her family "would benefit from DCS being involved" because the proceedings have helped Mother

> realize that what [she] was going through was abuse and needs to stop and that [she] cannot be [in] a situation like that any, ever [sic] again and [she] feel[s] like for [Child] . . . this cannot be swept under the rug. [Child] has seen and heard things, we just can't just [sic] ignore. [Child] needs someone professional to talk to.

*Id.* at 63. In other words, Mother testified that both she and Child were victims of domestic violence and expressed her desire that Child be adjudicated a CHINS.

[10]     Again, the juvenile court found that Child: "has clearly been affected by the violence she has seen between her parents"; "demonstrates anxiety symptoms such as picking at her nails and saying her stomach hurts"; and "demonstrates protective, mothering behavior toward her mother." Appellant's App. at 115. Accordingly, the juvenile court concluded that Child's physical and mental condition is seriously impaired and endangered as a result of the inability, refusal, or neglect of her parents to provide her with necessary shelter and supervision. Further, the juvenile court concluded that coercive intervention of the court is necessary because "Father does not believe that his violence toward Mother has affected [Child]" and because "it was not until he was arrested for domestic violence charges and forced from his home by a No Contact Order that he sought help for his opiate drug dependence." *Id.* at 116.

[11]     DCS presented evidence that Child was exposed to domestic violence and, as the juvenile court found, likely suffered as a result of that exposure. Mother testified that she is concerned about Child's anxiety, and, moreover, Mother expressed her desire that Child remain a CHINS in order to continue with services. We hold that the evidence is sufficient to support the juvenile court's adjudication of Child as a CHINS.

[12]     Affirmed.

Vaidik, C.J., and Baker, J., concur.