## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 23 2020, 10:37 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Valerie K. Boots
Marion County Public Defender Agency
– Appellate Division
Indianapolis, Indiana

Lisa M. Johnson
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE
INDIANA DEPARTMENT OF
CHILD SERVICES

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Matter of G.E.T., N.T., and G.T.T. (Minor Children),<br><br>R.T. (Mother),<br><br>*Appellant-Respondent,*<br><br>v.<br><br>Indiana Department of Child Services,<br><br>*Appellee-Petitioner,*<br><br>and | March 23, 2020<br><br>Court of Appeals Case No. 19A-JC-2521<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Mark A. Jones, Judge<br><br>The Honorable Diana Burleson, Magistrate<br><br>Trial Court Cause Nos.<br>49D15-1902-JC-519<br>49D15-1902-JC-520<br>49D15-1902-JC-521 |

Child Advocates, Inc.,[1]
*Appellee-Guardian ad Litem.*

**Mathias, Judge.**

R.T. ("Mother") appeals the Marion Superior Court's order adjudicating her three minor children as children in need of services ("CHINS"). Mother argues that the Department of Child Services ("DCS") failed to present sufficient evidence to support the adjudication.

We affirm.

## Facts and Procedural History

Mother and Father have three minor children, seven-year-old G.E.T., six-year-old N.T., and three-year-old G.T.T. The two youngest children have special needs.

In November 2018, Father threw a pop bottle at Mother, grabbed her from behind, and put her in a choke hold while the children were nearby. In a separate incident, Father tried to run Mother off the road with his vehicle. DCS received a report alleging abuse and neglect. DCS had trouble establishing contact with Mother and filed two motions to compel before Mother

---

[1] DeDe Connor filed an appearance on behalf of Child Advocates, Inc., but did not file a brief.

cooperated with the investigation. Father also refused to cooperate. Father has an extensive criminal history involving violent acts. DCS received a second report alleging neglect as a result of domestic violence in the home in January 2019. Mother obtained a protective order against Father in January 2019. She also sought assistance from the Julian Center. Tr. p. 30.

[5] On February 22, 2019, DCS filed a petition alleging that the children were CHINS. Neither Mother nor Father appeared at the initial hearing. The trial court ordered the children removed from Mother's and Father's care. Later that day, the DCS family case manager removed the two youngest children from their daycare, and then proceeded to G.E.T.'s school. Mother tried to break in the family case manager's vehicle while it was parked at G.E.T.'s school. She yelled and screamed at the case manager. The case manager called 911 for assistance because Mother's behavior was extremely combative.

[6] The children were initially placed in emergency foster care. Five days later, they were placed in relative care with their paternal grandmother. At the detention hearing held on March 8, 2019, the trial court ordered the children placed in a trial home visit with Mother. The trial court ordered Father to participate in supervised visitation.

[7] After the children had been removed from Mother's care, but before the March detention hearing, Mother met with the family case manager on February 26, 2019 and discussed the recent death of her mother and her relationship with Father. She also told the case manager that she was working with the Julian

Center, which was assisting Mother with filing for divorce and obtaining a protective order against Father.

[8] DCS services providers have observed Father trying to speak to Mother and describe him as "badgering" her. Tr. p. 69. Father acts belligerent and aggressive. He refused to participate in services. Father also asked DCS service providers if it was possible for Mother to have the protective order dismissed.

[9] At the May 31, 2019 fact-finding hearing, Mother gave contradictory testimony concerning her interactions with DCS service providers and whether she was asked to participate in certain services. Concerning her relationship with Father, Mother stated she obtained the protective order against Father because she "wanted personal space." Tr. p. 16. Mother did not agree that domestic violence services were necessary and stated that she did not have time to participate in services. Mother believes her relationship with Father is unhealthy but not unsafe. Mother was also noticeably pregnant with Father's child.

[10] At the hearing, the DCS family case manager testified that the CHINS petition was filed because of "multiple previous reports of domestic violence regarding DCS, the multiple police runs, the criminal history and the fact that . . . we had [to] file a motion in order to get mom to cooperate and that we had thought the children were not safe." Tr. p. 32. The home-based therapist testified that Mother minimalized Father's violent behavior and she did not understand DCS's involvement with her children. Mother did not believe that the violence

between herself and Father had any impact on the children. Tr. pp. 46–47. The home-based therapist discussed treatment goals with Mother including developing an understanding of unhealthy relationships, managing stress, and "working on grief and loss." Tr. p. 49.

[11]  Mother did not make any progress with her treatment goals and repeatedly cancelled appointments with the home-based therapist. Mother also failed to complete the domestic violence assessment recommended by the home-based therapist who feared for the "safety of the children." Tr. p. 54. She testified that "if [M]om does not understand fully that [Dad's] behavior can be dangerous and that that can be dangerous to the children that it's going to put her in a position to have difficulty protecting the children." *Id*. Family case manager Brittany Montgomery testified that her current concerns for the children include that the parents do not understand the severe effect that domestic violence has on the children. Tr. p. 68. The DCS case managers and service providers also all expressed concern that Mother and Father were not abiding by the terms of the no-contact order. But the services providers also agreed that Mother's interactions with the children and her home are appropriate.

[12]  On September 27, 2019, the trial court concluded that the children are CHINS because the parents are not able to provide the children with an environment free from domestic violence. The court found:

> [Mother] has admitted that her relationship with [Father] is
> unhealthy yet she has continued to have contact with [Father];
> [Mother] minimizes the effect of conflict and violence on the

children; and [Mother] has said that she will not or does not have time to participate in services and will not unless they are court ordered. [Father] does not understand how his behavior causes [Mother] and the children to be in danger. The parents have shown a pattern of violent behavior from November 2018. The children have been present when the police have been called on at least 2 occasions – in November 2018 when [Father] threw a pop bottle at [Mother], and in February 2019 when the FCM was removing the children from school. The parents need behavior modification and education regarding domestic violence that they will not receive without coercive intervention of the Court.

Appellant's App. p. 162.

The court issued the parental participation order on September 27, 2019 and ordered the children to continue in their temporary in-home trial visit in Mother's home. Mother was ordered to participate in home-based case management and home-based therapy with a domestic violence component. Mother now appeals the CHINS adjudication. Father does not appeal.

## Discussion and Decision

Our Supreme Court has explained the nature of a CHINS proceeding and appellate review of a CHINS finding as follows:

A CHINS proceeding is a civil action; thus, the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code. We neither reweigh the evidence nor judge the credibility of the witnesses. We consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. We reverse only upon a showing that the decision of the trial court was clearly erroneous.

*In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012) (quotations and citations omitted) (footnote and internal header omitted).

[15] Moreover, when a trial court supplements a CHINS judgment with findings of fact and conclusions of law, we apply a two-tiered standard of review. First, we consider "whether the evidence supports the findings" and, second, "whether the findings support the judgment." *In re D.J. v. Ind. Dep't Child Servs.*, 68 N.E.3d 574, 578 (Ind. 2017). A CHINS determination will only be reversed if it was clearly erroneous. *Id.* "A decision is clearly erroneous if the record facts do not support the findings or 'if it applies the wrong legal standard to properly found facts.'" *Id.* (citation omitted).

[16] To meet its burden of establishing CHINS status, DCS must prove that the child is under age eighteen,

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision;
>
>> (A) when the parent, guardian, or custodian is financially able to do so; or
>>
>> (B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and

> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Ind. Code § 31-34-1-1.

[17] Although the acts or omissions of one or both parents can cause a condition that creates the need for court intervention, the CHINS designation focuses on the condition of the children rather than on an act or omission of the parent(s). *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). In other words, despite a "certain implication of parental fault in many CHINS adjudications, the truth of the matter is that a CHINS adjudication is simply that – a determination that a child is in need of services." *Id.* (citations omitted). Furthermore, "when determining CHINS status under Section 31-34-1-1, particularly the 'coercive intervention' element, courts 'should consider the family's condition not just when the case was filed, but also when it is heard.'" *In re D.J.*, 68 N.E.3d at 580 (quoting *In re S.D.*, 2 N.E.3d 1283, 1290 (2014) (citation omitted)). "Doing so avoids punishing parents for past mistakes when they have already corrected them." *Id.* at 581.

[18] DCS alleged that the children were CHINS because Mother and Father failed to provide them "with a safe, stable, and appropriate living environment free from domestic violence." Appellant's App. p. 44. It is well established that a child's exposure to domestic violence is serious and traumatic and can support a CHINS finding. *E.g., In re N.E.*, 919 N.E.2d at 106; *see also In re E.M.*, 4 N.E.3d 636, 644–45 (Ind. 2014) ("A lack of beatings therefore does not equate to a lack of abuse, nor does the children's tender age equate to a lack of harm.

Infants as young as fifteen months exhibit behavioral disturbances from spousal violence," including symptoms akin to post-traumatic stress disorder in adults.)

[19] In this case, Mother and Father have not lived together since July 2018. But Mother is pregnant with Father's child. In January 2019, Mother sought assistance from the Julian Center and obtained a protective order against Father.[2] Mother stated that she intended to divorce Father, but she did not have money to pay the filing fee. She testified that she filed a motion requesting waiver of the filing fee. Tr. p. 90.

[20] The DCS service providers agreed that Mother's home is appropriate and the children are safe with her. The children were returned to Mother's care on March 8, 2019, for a temporary trial home visit, and they have remained in her care since that date.

[21] DCS proved that Mother had alleged two separate incidents of domestic violence. Both occurred before Mother obtained the protective order in January 2019 and before the children were removed in February 2019. There were no reports of domestic violence after Mother obtained the protective order. DCS proved that Mother and Father had contact in violation of the protective order. However, the only known interaction between them occurred outside the courtroom while Mother and Father were waiting for court hearings to begin.

---

[2] It is possible that the child was conceived before Mother obtained the protective order, but the record does not conclusively establish Mother's due date. She was visibly pregnant in June 2019.

Tr. p. 53. They were observed sitting together and arguing before the court hearings. The DCS case worker described Father "badgering" Mother and reported that Mother was trying to get away from him. Tr. pp. 69–70. On one occasion, Mother and Father walked out of the courtroom's waiting area together. Tr. p. 53. Mother admitted that she and Father have an "unhealthy relationship." Tr. p. 44. But she does not characterize their relationship as abusive. Tr. p. 47.

[22] The home-based therapist could not recommend case closure because

> if the case closes today, this family will not receive any domestic violence treatment or assistance. I think there is a need for the domestic violence treatment for the safety of the children. I think if mom does not understand fully that [Father's] behavior can be dangerous and that that can be dangerous to the children that it's going to put her in a position to have difficulty protecting the children. I don't think based on the conversation that I've had with mom that mom feels dad is a threat and is dangerous or is of concern even with conversations today.

Tr. p. 54. The therapist also testified that children can be affected by domestic violence even if they are not present when it occurs. Tr. p. 58 ("[w]hen there is violence and parent's behaviors are impacted by that emotionally, then a child's behavior is impacted by that"). She stated that Mother's children have been affected because "the older child does get caught up in between mom and dad's arguments and is used in between to gain information regarding mom. That's what's been reported." *Id.* The family case manager shared the same concerns. Tr. pp. 67-69.

[23] Because it was not court-ordered, Mother did not follow DCS's recommendation to participate in a domestic violence assessment. And the family case manager was concerned that the pattern of domestic violence would continue in Mother's home. Tr. p. 70. Mother also failed to participate in therapy with the home-based family therapist. Tr. p. 49. The case manager expressed concerned that Father is still involved in Mother's life. Tr. p. 73.

[24] Mother refuses to admit that Father is abusive. Aside from obtaining a protective order, she has not taken steps to address the issue of domestic violence. DCS has observed Mother violating the protective order by sitting with Father while waiting for courtroom proceedings to begin. DCS proved by a preponderance of the evidence that Mother has not acknowledged or addressed the impact domestic violence has on herself and her children. Although there is evidence supporting Mother's argument that the children are not in need of services, it is not our role to reweigh the evidence and the credibility of the witnesses. *See In re K.D.*, 962 N.E.2d at 1253; *see also Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016) (explaining that appellate courts grant latitude and deference to trial courts in family law matters).

[25] For all of these reasons, we affirm the trial court's order adjudicating Mother's children as CHINS.

[26] Affirmed.

Kirsch, J., and Bailey, J., concur.