## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 06 2018, 8:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Glen E. Koch II
Boren, Oliver & Coffey, LLP
Martinsville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of:
G.P. and G.B. (Minor Children),

and

H.P. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

February 6, 2018

Court of Appeals Case No.
55A04-1709-JT-2117

Appeal from the Morgan Circuit Court

The Honorable Matthew G. Hanson, Judge

Trial Court Cause Nos.
55C01-1605-JT-206
55C01-1605-JT-207

**Baker, Judge.**

[1] H.P. (Mother) appeals the trial court's order terminating the parent-child relationship between Mother and her two children. She argues that there is insufficient evidence supporting the termination order. Finding the evidence sufficient, we affirm.

## Facts

[2] Mother and J.B. (Father)[1] were married and had two children: G.P., born May 13, 2011, and G.B., born April 3, 2013. On April 1, 2013, the parents were arrested for theft and neglect of a dependent after they were shoplifting while G.P. was present.

[3] G.B. tested positive for amphetamines, methadone, and benzodiazepines at the time of his birth. That day—April 3, 2013—the Department of Child Services (DCS) removed the children from the parents' care and custody because of G.B.'s positive drug screen and because Mother and Father had engaged in domestic violence while G.P. was present. The police department had been called out to their home four times in the preceding three months for domestic violence incidents. On April 5, 2013, DCS filed a petition alleging that the children were children in need of services (CHINS). The parents eventually admitted that the children were CHINS because they were both incarcerated following the shoplifting incident. On June 12, 2013, the trial court issued a dispositional decree ordering Mother to complete a substance abuse assessment

---

[1] Father does not participate in this appeal.

and comply with any recommendations, submit to random drug screens, complete all terms of her probation, and attend all supervised visitation.

[4] Mother was found guilty of the charges stemming from the April 1, 2013, shoplifting incident. She was initially incarcerated at the Indiana Women's Prison, and in June 2014, she was transferred to a work release program, where she participated in a parenting group and a relapse prevention program. In August 2014, the children began a trial home visit with Father, but when DCS caught Mother attempting to visit the children at Father's home on August 20, 2014, the trial home visit was ended.[2] On September 29, 2014, she was returned to the Indiana Women's Prison after she refused a drug screen. On May 14, 2015, she was released from the Department of Correction.

[5] On May 26, 2015, Mother completed a substance abuse assessment. At that time, she tested positive for alcohol. It was recommended that she participate in, among other things, intensive outpatient treatment (IOP), homebased case management, and individual therapy. Mother successfully completed IOP and individual therapy. She then began participating with recovery coaching and individual skills coaching.

---

[2] The children began a second trial home visit with Father in December 2014. In February 2015, Father was arrested at his residence for being intoxicated and getting into a car accident. He had left the children home alone and was arrested for neglect of a dependent. The trial home visit ended that day.

[6] Beginning in June 2015, Mother began participating with supervised visits. She struggled to discipline the children consistently. At times, Father was also present, and the parents began to have tension during the visits in August 2015.

[7] On September 25, 2015, the trial court authorized Mother to have unsupervised visits with the children. In February 2016, the parents began to have unsupervised overnight visits. On March 18, 2016, the children began a trial home visit with both parents. On May 21, 2016, Mooresville Police officers were dispatched to the home after receiving a report of domestic violence. When police arrived, both parents were intoxicated and both parents had fresh injuries to their faces. Mother reported that Father had physically harmed her and she had to fight to get him off her. The children were present in the home when the incident occurred and G.P. indicated that he had seen the altercation. Father was arrested for domestic battery and DCS removed the children from the parents' care and custody. A no contact order was put in place between the parents, but the children's paternal grandmother saw the parents together more than once despite that order.

[8] On June 1, 2016, DCS filed a petition to terminate the parent-child relationship between Mother, Father, and the children. The factfinding hearing on DCS's

petition spanned five separate days between August 29, 2016, and August 11, 2017.[3]

[9] In the months during the termination hearings, G.B. was combative before visits, stated he did not want to see Mother, and often had "a frightened look on his face, glossy, kind of glazed over eyes" during the visits. Tr. Vol. II p. 58-59. The visitation supervisor noted that G.B. was not emotionally attached to Mother. At times Mother was combative with the visitation supervisor, who recommended that Mother's visits with the children remain supervised.

[10] Since the termination petition was filed, Mother has participated in and successfully completed a recovery group, domestic violence services, and a psychological evaluation. She participated with drug screens but had multiple failures to appear and multiple screens that were positive for alcohol. In May 2017, Mother began participating with homebased case management to help her find employment and stable housing. She remained unemployed throughout the proceedings.

[11] At some point during the termination proceedings, Mother filed a petition to dissolve her marriage; the divorce became final in February 2017. The Family Case Manager (FCM) testified that while Mother and Father "are trying to give the impression that they're not going to be together," it was "clearly evident"

---

[3] At one point when visits and services were going well, the trial court put the termination proceedings "on hold" to give the parents more time. Appealed Order p. 21.

that "they have no intention of separating themselves . . . ." Tr. Vol. III p. 213-14. Indeed, at a team meeting on June 28, 2017, Mother stated that she was done with Father and would only have contact with him for co-parenting purposes, but three days later, the parents were arrested together.

[12] On July 1, 2017, the Mooresville Police Department was dispatched to Mother's home because of complaints regarding a loud car stereo. When police arrived, they noticed that Mother was "highly intoxicated" and had an "abusive attitude" towards the officers. *Id.* at 79. The officers told Mother to go inside her house and left the scene. A couple of hours later, the police department received a call about a domestic disturbance at Mother's home. When police arrived, Mother was on the porch crying and reported that she and Father had gotten into a physical altercation. The officer noted that Mother had signs of being battered around her neck and that her face was very red. Father also had marks on his neck and hands. Both parents were arrested. When the FCM asked Mother about the arrest, Mother stated that it was not a big deal because it was "only a misdemeanor . . . ." *Id.* at 212. Mother never recognized the effects that her alcohol use or instances of domestic violence have on the children.

[13] Both children have struggled because of their parents' behavior. At the time of the initial removal, G.P. was skinny and frail; at one point, his weight was at the .8 percentile on the growth chart. He has been diagnosed with reactive attachment disorder and post-traumatic stress disorder, and he participates with individual therapy, family therapy, skills training, and case management.

During play therapy sessions, G.P. has expressed themes including destruction, drowning, killing, putting people in jail, and burying, which the therapist associates with children who have witnessed abuse or have been abused. G.P. avoids talking about Mother and Father. G.B. was born prematurely and had to be placed on a medication taper for neonatal withdrawal symptoms at the time of his birth. He has also had periodic severe respiratory distress issues. G.B. has motor delays and developmental delays, and participates with physical therapy, speech therapy, and occupational therapy. At the time of the termination hearing, the children were thriving in their preadoptive foster placement, were bonded with their foster parents, and were participating with all needed services.

[14] On August 14, 2017, the trial court issued an order terminating the parents' relationships with the children. The trial court's order is thorough and detailed. In relevant part, it found as follows:

> 386) In this case, the children were removed originally due to allegations of neglect and/or abuse, more particularly due to the presence of a drug in the youngest child's system when he was born, arrests of both parents, as well as several contacts with police regarding domestic violence between the parents in previous weeks.

> 387) That during a good portion of this early case the mother was incarcerated and was both in local jail and prison. Most recently she was arrested for disorderly conduct with father.

***

389) That prior to removal of the children, the DCS attempted to address the matters of domestic violence that were prevalent between mother and father.

***

391) That early on there were some drug issues with the mother, however those have seemingly been remedied.

392) That it [was] apparent early on that alcohol was the main culprit that thereafter led to acts of violence between the parties.

***

394) That while it is true the parents have been clean from drugs and more often than not clean from alcohol use during this case, they have sudden and very apparent issues of violence that surround their use about every year or so when they are out of jail and can get together.

395) The parents did take substantial steps at times to get involved with addictions counseling as well as domestic violence counseling over the years.

396) The mother has been very successful in her services, when she was out of jail.

***

426) That to add to these incidents of domestic violence that keep occurring, it is apparent that the divorce between the parties was a sham.

427) Not only have the parties violated no contact orders between one another during the life of this case, but also ignored instructions from the DCS to not permit the mother to visit the children when she was [on work release].

428) Likewise, the mother did not file for divorce from the husband until right after the termination [petition was] filed and clearly even after the divorce was granted has no intentions of staying away from the husband.

\*\*\*

431) . . . [T]hese parties are exactly where they were when this case started.

432) Simply, they get together, decide to drink, get violent with one another and sometimes someone goes to jail.

\*\*\*

436) That there is no question that throughout this case the parents have visited with the children and have been appropriate almost one-hundred percent of the time.

\*\*\*

438) That on the other hand it is apparent that these parents have not shown the ability to do what is necessary to ensure there are no future threats to these children.

439) As stated above, these children have been around domestic violence with these parents multiple times.

443)   Both parents still, even after all of the successful counseling sessions and therapy appointments refuse to see anything wrong with drinking and then hitting . . . each other and finding this acceptable.

444)   Likewise, even when ordered to stay away from one another, or even after being divorced, they continue this fatal attraction that poses a serious and ongoing threat to the children.

445)   Even though the parents have shown an ability to carry out counseling, to work at times and even to provide homes with the help of other relatives, they are a danger to these children.

446)   That the danger that still exists today for these children is the same danger that has existed over the life of this case.

Appealed Order p. 26-31.  Mother now appeals.

# Discussion and Decision

## I.  Standard of Review

[15]   Our standard of review with respect to termination of parental rights proceedings is well established.  In considering whether termination was appropriate, we neither reweigh the evidence nor assess witness credibility. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013).  We will consider only the evidence and reasonable inferences that may be drawn therefrom in support of the judgment, giving due regard to the trial court's

opportunity to judge witness credibility firsthand. *Id.* Where, as here, the trial court entered findings of fact and conclusions of law, we will not set aside the findings or judgment unless clearly erroneous. *Id.* In making that determination, we must consider whether the evidence clearly and convincingly supports the findings, and the findings clearly and convincingly support the judgment. *Id.* at 1229-30. It is "sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005).

[16] Indiana Code section 31-35-2-4(b)(2) requires that a petition to terminate parental rights for a CHINS must make the following allegations:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from

> the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B)     that one (1) of the following is true:

       (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

       (ii)     There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

       (iii)     The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)     that termination is in the best interests of the child; and

(D)     that there is a satisfactory plan for the care and treatment of the child.

DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1230.

## II. Termination Order

## A. Remedy of Reasons For Removal

[17]     Mother first argues that DCS did not prove by clear and convincing evidence that there is a reasonable probability that the conditions that resulted in the children's removal or the reasons for placement outside her home will not be

remedied. In addressing this prong of the statute, DCS need not rule out all possibilities of change; instead, it must establish a reasonable probability that the parent's behavior will not change. *In re B.J.*, 879 N.E.2d 7, 18-19 (Ind. Ct. App. 2008).

[18] The reasons for the children's initial and continued removal from the parents' care and custody can be summarized as: domestic violence and substance and/or alcohol abuse, which are often inextricably linked for these parents.

[19] It is undeniably true, as Mother asserts, that she has participated in—and successfully completed—many court-ordered services throughout this case. And it is also true, as the trial court noted, that there is no evidence that she has an ongoing drug abuse issue.

[20] Despite her participation with services, however, Mother has not been able to remedy the underlying problems. She continues to spend time with Father. And when they are spending time together, she continues to consume alcohol. Time and time again, that combination leads to physical violence between the two. While she went so far as to divorce Father, the trial court concluded that the divorce was a sham. We see no reason to second-guess that conclusion, as Mother and Father were arrested together following a violent incident during which she was heavily intoxicated, and this occurred *during* the termination proceedings and months *after* their divorce was finalized.

[21] This case has been open for nearly five years. Mother has participated with nearly every imaginable service and has been given numerous chances to fix the

situation. But despite time and opportunity, very serious issues remain. Under these circumstances, we find that the trial court did not err by finding that DCS proved by clear and convincing evidence that there is a reasonable probability that the reasons for the children's removal from Mother's care and custody will not be remedied.

## B. Harm to Children's Well-Being

[22]  Mother's only other argument on appeal is that DCS failed to prove that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the children's well-being. This prong of the statute and the prong related to the remedy of the reasons for the children's removal are phrased in the disjunctive. I.C. § 31-35-2-4(b)(2)(B). As we have found that the evidence supports the latter, we need not also consider the former. But we will do so briefly.

[23]  The record reveals that the children have been present during more than one violent incident between the parents. And during the CHINS case, they were placed on a trial home visit with one or both parents on three occasions, and on each of those three occasions, had to be removed yet again. Our Supreme Court has acknowledged the trauma caused to children who witness domestic violence:

> "[M]any people assume that very young children are not affected at all" by violence between their parents, "erroneously believing that they are too young to know or remember what has happened." Joy D. Osofsky, *The Effects of Exposure to Violence on*

*Young Children,* 50 Am. Psychologist 782, 783 (1995). But "even in the earliest phases of infant and toddler development, clear associations have been found between exposure to violence and post-traumatic symptoms and disorders." *Id.* Indeed, "[t]he developing brain is most vulnerable to the impact of traumatic experiences" *before age one*—and during the first *three* years, those experiences actually change the organization of the brain's neural pathways. Abigail Sterne et al., *Domestic Violence and Children: A Handbook for Schools and Early Years Settings* 19 (2010) (citations omitted); Allan N. Schore, *The Effects of Early Relational Trauma on Right Brain Development Affect Regulation, and Infant Mental Health,* 22 Infant Mental Health J. 201, 209-10 (2001).

A lack of beatings therefore does not equate to a lack of abuse, nor does the children's tender age equate to a lack of harm. Infants as young as fifteen months exhibit behavioral disturbances from spousal violence. Charles H. Zeanah, et al, *Disorganized Attachment Associated with Partner Violence: A Research Note.* 20 Infant Mental Health J. 77, 82–83 (1999).

*In re E.M.*, 4 N.E.3d 646, 644 (Ind. 2014) (emphases original).

[24] Indeed, in this case, both children were already being negatively affected by the upheaval and violence they had experienced in their short lives. G.P. was diagnosed with post-traumatic stress disorder and reactive attachment disorder, and wove disturbing and violent themes into his play therapy sessions. When he was originally removed from the parents' care and custody, he was dangerously skinny and frail. G.B. became combative when he visited with Mother, said that he did not want to see her, and during visits he frequently appeared frightened. Both children are participating in multiple services to address developmental delays and emotional issues.

Given the record of ongoing domestic violence between the parents, as well as the harm that the children have already suffered as a result, we find that the trial court did not err by concluding that DCS had proved by clear and convincing evidence that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the children's well-being.

The judgment of the trial court is affirmed.

Riley, J., and Brown, J., concur.