## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 02 2019, 10:08 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly S. Lytle
Banks & Brower LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of: J.W. and Ja.W., Children in Need of Services:

Z.W. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

April 2, 2019

Court of Appeals Case No.
18A-JC-1655

Appeal from the Parke Circuit Court

The Honorable Sam A. Swaim, Judge

Trial Court Cause Nos.
61C01-1801-JC-33
61C01-1801-JC-35

**Bradford, Judge.**

# Case Summary

[1] The Indiana Department of Child Services ("DCS") became involved with Z.W. ("Father"); H.W. ("Mother"); and their children, B.M., Ja.W., and J.W. (collectively, "the Children") after receiving reports of domestic abuse in the family's home. Due to concerns about the effect the alleged domestic abuse had on the Children, DCS filed petitions alleging that they were children in need of services ("CHINS"). The Children were initially left in the home but were later removed after additional concerns for their safety were raised. Following a fact-finding hearing, the juvenile court found the Children to be CHINS and ordered Father and Mother (collectively, "Parents") to participate in certain services. On appeal, Father contends that (1) the record does not establish that removal of Ja.W. and J.W. from the home was necessary and (2) the evidence is insufficient to sustain the CHINS findings.[1] We affirm.

# Facts and Procedural History

[2] Parents are married. Father is the biological father of Ja.W. and J.W. and the step-father of B.M. Mother is the biological mother of B.M. and J.W. and the step-mother of Ja.W.

---

[1] Mother does not participate in the instant appeal.

[3] Substantiated allegations of domestic abuse between Parents first arose in 2016. DCS became involved with the family at that time and Parents were offered an informal adjustment. The case was eventually closed.

[4] In December of 2017, DCS received two reports of alleged domestic abuse. The first involved an allegation that Father had hit Mother with a broom. The second involved an allegation that Father had slapped Ja.W. in the face.

[5] DCS Family Case Manager ("FCM") Kilee Fagg spoke with Ja.W. on December 15, 2017. Ja.W. told FCM Fagg that "he was slapped in the face by his father … due to his glasses being bent and his father was angry about that, and the mark had been there for a couple of days, making him miss two days of school." Tr. Vol. II p. 108. Ja.W. also told FCM Fagg that Father "wanted him to lie about the incident" and say that "he had fallen into the coffee table due to roughhousing with his two[-]year[-]old brother." Tr. Vol. II p. 108.

[6] That same day, FCM Fagg also spoke to B.M., who reported domestic violence between Parents. B.M. indicated that on one occasion, Mother "had been sweeping the floor with a broom, and [Parents] had gotten into a verbal altercation, and [Father] grabbed the broom and hit [Mother] with the broom." Tr. Vol. II p. 110. B.M. further indicated that (1) she had previously seen bruises on Mother and was aware that the bruises were caused by Father, (2) she had previously overheard yelling between Parents, and (3) she had heard things being broken during arguments between Parents. B.M. admitted that she

"worries when she goes to the home about the arguing and the fighting." Tr. Vol. II p. 118.

[7] DCS received an additional report of abuse in the home on January 5, 2018. Parents both denied this additional report, which indicated that, following an altercation with Father, Mother had a broken arm. Mother subsequently admitted that she had lied and that she had had a broken arm. However, she later changed course and again denied ever having a broken arm.

[8] DCS filed petitions on January 29, 2018, alleging that the Children were CHINS. J.W. and B.M. were left in Mother's care and Ja.W. was left in the joint care of his biological mother and Father. As a condition of leaving the Children in the home, Mother agreed that Father would not stay at the home with her and B.M. and J.W. This restriction was put in place to alleviate DCS's concerns of potential further domestic abuse between Parents.

[9] Parents indicated during a March 5, 2018 hearing that Father was not residing with Mother. However, the next day, Ja.W. indicated that he was visiting with Father at both his grandparents' home and the family's home and that Father was staying at the home with Mother "most of the time." Appellant's App. pp. 87, 91. Also on March 6, 2018, it was reported that Father was making inappropriate comments to B.M., including comments suggesting that her biological father wanted to kill Father.

[10] On March 10, 2018, FCM Kacey Blundell received a text message from Ja.W. indicating that Father had never hit him. FCM Blundell later received a second

text indicating the same. DCS became concerned that Father was trying to inappropriately influence Ja.W.

[11] Father's vehicle was observed at the home on March 15, 2018. The next morning, Father's vehicle was parked in the same spot and did not appear to have been moved since the night before. FCMs Blundell and Fagg went to the home at 4:00 p.m. on Friday, March 16, 2018, "for a weekly contact that needed to be made." Tr. Vol. II p. 30. FCMs Blundell and Fagg were accompanied by law-enforcement officers. When they arrived, Father's vehicle was parked at the home and did not appear to have been moved since the day before. FCMs Blundell and Fagg felt this fact confirmed their suspicions that Father was residing with Mother at the home. FCMs Blundell and Fagg decided that in order "to ensure the safety of the children, it was in the best interest to remove the children from home at that time." Tr. Vol. II p. 32. The Children were removed that day at 4:33 p.m. Once removed, B.M. was placed with her biological father, Ja.W. was placed with his biological mother, and J.W. was placed with his paternal aunt.

[12] The juvenile court conducted a detention hearing on March 19, 2018. During the hearing, the juvenile court considered evidence relating to the recent abuse allegations as well as the fact that Parents had pending criminal charges relating to prior abuse allegations. The Children's court-appointed special advocate ("CASA") recommended that the juvenile court continue the Children's removal and current placements. At the conclusion of the hearing, the juvenile court granted DCS's request for removal of the Children from the home,

finding that DCS "made reasonable efforts to prevent the removal and that removal would be in the best interests of the children at this time." Tr. Vol. II p. 67. The juvenile court further ordered that the Children's current placements continue.

[13] During the March 23, 2018 fact-finding hearing, DCS presented evidence that between October 20, 2016 and January 5, 2018, law enforcement authorities had responded to the home at least seven times for domestic incidents. According to law enforcement records, Father was alleged to have pointed a loaded gun at Mother in October of 2017. Also in October of 2017, Parents were charged with disorderly conduct following a domestic incident.[2] On one occasion, Father called law enforcement because he believed that Mother had taken his keys to keep him from leaving. On yet another occasion, Mother claimed to have been tangled in a phone cord. Parents denied that Father had ever physically harmed Mother.

[14] While Parents denied the abuse allegations, the Children disclosed numerous incidents of verbal and physical abuse between Parents. Ja.W. indicated that he had observed Mother throw a water bottle at Father and B.M. indicated that she had observed Father grabbing Mother's shirt and hitting Mother with water

---

[2] It is unclear from the record whether the charges, which remained pending as of the date of the fact-finding hearing, stemmed from the incident with the gun or a separate incident.

bottles and a broom. Ja.W. also disclosed "a lot of arguing and yelling" between Parents. Tr. Vol. II p. 100.

On April 10, 2018, the juvenile court issued orders finding the Children to be CHINS. The juvenile court continued the Children's placements outside Parents' care and ordered Parents to participate in certain services.

# Discussion and Decision

## I. Removal from Home

Father contends that DCS improperly removed Ja.W. and J.W. from the home without complying with Indiana Code sections 31-34-2-3 and 31-34-2-6. In making this contention, he argues that the detention order is not supported by evidence and that his constitutional rights were violated by DCS's failure to comply with the above-cited statutes. For its part, DCS contends that it had the authority to remove Ja.W. and J.W. from the home and that it followed the statutory requirements in doing so.

Indiana Code section 31-34-2-3 provides that DCS may, acting with probable cause to believe a child is a CHINS, remove the child from the parents' home if:

> (1) it appears that the child's physical or mental condition will be seriously impaired or seriously endangered if the child is not immediately taken into custody;
> (2) there is not a reasonable opportunity to obtain an order of the court; and
> (3) consideration for the safety of the child precludes the immediate use of family services to prevent removal of the child.

[18] Once a child is removed from the parents' home, DCS is required to make written documentation evidencing the following:

> (1) The facts establishing probable cause to believe that the child is a child in need of services.
> (2) Why the child's physical or mental condition will be seriously impaired or seriously endangered if the child is not immediately taken into custody.
> (3) Why the person is unable to obtain a court order and what steps have been taken to obtain a court order.
> (4) Why the department of child services is unable to protect the safety of the child without taking the child into custody.
> (5) Why the person is unable to obtain the assistance of a law enforcement officer if the child is taken into custody by a probation officer or caseworker without the assistance of a law enforcement officer.

Ind. Code § 31-34-2-6.

[19] The juvenile court granted wardship of Ja.W. and J.W. to DCS at the February 7, 2018 initial hearing. Specifically, the juvenile court found "responsibility for the placement and care of [Ja.W. and J.W.] is ordered or continues to be ordered to the DCS." Appellant's App. pp. 81, 83. While no order was issued barring Father from the home, DCS made it clear to Mother that in order for DCS to ensure that the Children could safely remain in the home, Father was not to be at the home. During a March 5, 2018 pre-trial conference, Father assured the juvenile court and DCS that he was not residing with Mother.

[20] In an affidavit dated March 19, 2018, FCM Blundell averred as follows:

6. On March 6, 2018, [Ja.W.], stated that he was visiting his Father at both his grandparent's house and [Mother's] house. He indicated that [Father] was staying at [Mother's] home most of the time.

7. On or about March 6, 2018, it was reported that [Father] was saying inappropriate things to [B.M.] such as [Father] telling the Child that her [f]ather wanted to kill [him].

8. On March 10, 2018 FCM Blundell received a text from [Ja.W.] stating that he never said his dad hit him. A second text was sent later stating the same thing.

9. That [Ja.W.] participated in a child hearsay evaluation but DCS is concerned that Father is trying to influence the Child.

10. On March 15, 2018, [Father's] vehicle was observed at [Mother's] home and it is believed that [Ja.W.] and/or B.M. were visiting their respective Parent. [Father's] vehicle was observed at the home on the morning of March 16, 2018 and did not appear to have been moved since the night before.

11. On March 16, 2018, FCM's [sic] Blundell and Fagg went to the home of [Mother]. [Father's] vehicle was observed in the driveway at the home of [Mother].

12. A decision was made to remove the [Children] as [their] safety could not be assured.

13. [Mother] screamed to B.M. "Do you see what you did, is this what you wanted?" B.M. began to cry.

Appellant's App. pp. 87–88, 91–92. In addition to these averments, FCM Blundell testified during the removal hearing that she and FCM Fagg arrived at Mother's home at 4:00 p.m. on Friday, March 16, 2018, "for a weekly contact that needed to be made." Tr. p. 30. FCMs Blundell and Fagg were accompanied by law enforcement officers. Given the apparent confirmation of their suspicions that Father was residing with Mother at the home coupled with their inability to protect the Children from the alleged domestic abuse while

Parents resided together, FCMs Blundell and Fagg decided that in order "to ensure the safety of the children, it was in the best interest to remove the children from home at that time." Tr. p. 32. The Children were removed at 4:33 p.m. on March 16, 2018.

[21] Father argues that DCS failed to present any evidence as to why it could not have received a court order prior to removal or why services could not have been provided to prevent the need for removal. The evidence demonstrates that FCMs Blundell and Fagg felt that the only way to ensure the Children's safety and to protect them from being exposed to further domestic abuse was to make sure that Father was not present at the home, that Parents were aware of this, and that Father was nonetheless residing in the home. FCMs Blundell and Fagg arrived at the home at 4:00 p.m. on a Friday afternoon and determined that, despite being aware of the condition for continued in-home placement, Father was residing at the home with Mother. While it perhaps might have been most prudent for DCS to spell this out explicitly in the record, one may reasonably assume that DCS could not have received a court order after 4:00 p.m. on a Friday afternoon.

[22] FCMs Blundell and Fagg acted in a manner appropriate to protect the Children during the upcoming weekend and a removal hearing was held the following Monday. We cannot say that DCS's belief that the only way to ensure the Children's safety going forward was to remove them from the home was unreasonable. As such, we conclude that the evidence is sufficient to support DCS's decision to remove Ja.W. and J.W. from the home. In addition, Father

has failed to convince us that DCS violated his constitutional rights by removing Ja.W. and J.W. from the home.

## II. CHINS Determination

[23] Father also contends that the juvenile court erred in determining that J.W. and Ja.W. were CHINS.

> A CHINS proceeding is a civil action; thus, the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code. We neither reweigh the evidence nor judge the credibility of the witnesses. We consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. We reverse only upon a showing that the decision of the trial court was clearly erroneous.

*In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012) (internal citations and quotations omitted).

[24] Indiana Code section 31-34-1-1 provides that a child is a CHINS, if before the child becomes eighteen years of age,

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
> (2) the child needs care, treatment, or rehabilitation that:
> > (A) the child is not receiving; and
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

The Indiana Supreme Court has interpreted this section as requiring "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). "A CHINS adjudication focuses on the condition of the child" and "the acts or omissions of one parent can cause a condition that creates the need for court intervention." *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). However, "[a] CHINS finding should consider the family's condition not just when the case was filed, but also when it is heard." *In re S.D.*, 2 N.E.3d at 1290.

[25]    The juvenile court largely based its determination that the Children were CHINS on the numerous allegations of domestic abuse between Parents and the continued risk of domestic abuse so long as Parents resided together. In *In re E.M.*, 4 N.E.3d 636, 644 (Ind. 2014), the Indiana Supreme Court reviewed a CHINS determination and held that it was reasonable for the trial court to find that the father's violence against the mother could also be considered to be abuse of the children and the trial court was not required to believe that the children were unaffected by the violence. We agree with the Indiana Supreme Court that exposure to abuse between parents places the well-being of the children at risk. Given this risk coupled with evidence of additional abuse of Ja.W. by Father, we conclude that DCS met its burden of proving that J.W. and Ja.W. are CHINS. Father's arguments to the contrary amount to nothing

more than a request for us to reweigh the evidence, which we will not do. *In re K.D.*, 962 N.E.2d at 1253.

[26] The judgment of the juvenile court is affirmed.

Crone, J., and Tavitas, J., concur.