## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 31 2020, 10:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

John R. Worman
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of: S.L. and S.B. (Minor Children) | March 31, 2020 |
| | Court of Appeals Case No. 19A-JT-2459 |
| B.L. (Father), | |
| *Appellant*, | Appeal from the Vanderburgh Superior Court |
| v. | The Honorable Brett J. Niemeier, Judge |
| | The Honorable Renee Ferguson, Magistrate |
| Indiana Department of Child Services, | Trial Court Cause Nos. 82D04-1903-JT-409 82D04-1903-JT-410 |
| *Appellee*. | |

**Brown, Judge.**

[1] B.L. ("Father") appeals the involuntary termination of his parental rights to his children, S.B. and S.L. We affirm.

## *Facts and Procedural History*

[2] S.B. was born on April 26, 2017. In September 2017, the Department of Child Services ("DCS") filed a petition alleging S.B. was a child in need of services ("CHINS") and that Father engaged in domestic violence and illegal drug use. The court found S.B. was a CHINS and, in a dispositional order, required that Father not use illegal substances or alcohol, complete a substance abuse assessment and complete all recommendations, submit to random drug screens, not commit any acts of domestic violence, and attend all scheduled visitations. From January until April 17, 2018, Father was placed on work release and then incarcerated for contempt due to possession of a lookalike substance.

[3] S.L. was born on April 27, 2018, and removed from the care of Father and the children's mother. In May 2018, the court determined S.L. was a CHINS and entered a dispositional order with requirements for Father similar to the one in the CHINS case for S.B. Father was charged on August 30, 2018, with domestic battery against the children's mother as a level 5 felony and resisting law enforcement as a class A misdemeanor, pled guilty to these charges in January 2019, and received jail credit of 154 days. In September 2018 the court found Father in contempt for testing positive for alcohol, missing two supervised visits, having his parent aide services canceled due to noncompliance, and not participating in his parental education training. In November 2018, the court issued an order on periodic case review stating that

Father was incarcerated, he was noncompliant with drug screens and parent aide sessions before his arrest, visitation was placed on hold due to his noncompliance, and he had not completed substance abuse or domestic violence treatment.

[4] On March 4, 2019, DCS filed petitions to terminate Father's parental rights as to the children. The court held a factfinding hearing concluding in August 2019. Father testified that he owned a house but that, as of January, he did not live there because he did not have electricity or water utilities and that he was staying at the Rescue Mission until he found a job. He testified he used to be employed, he had a stroke about two months earlier, and that is when he stopped working. At one point, Father indicated he had never seen S.L. He also indicated he never paid child support for any of his children. When asked about his other children, he said "[h]ow many? I don't know how many. About 8 or something. I'm not sure." Transcript Volume II at 38-39. When asked if he could care for the children if they went home with him as of the day of the hearing, Father replied that he did not think he could. He indicated he had a stroke in 2016 and a more severe stroke during these proceedings.

[5] Family Case Manager Lauren Koehler ("FCM Koehler") testified S.B. was originally removed due to allegations the parents had admitted to using methamphetamine and there were previous multiple runs for domestic violence. She testified that S.L. was removed because the children's mother admitted to using drugs while pregnant and the parents were noncompliant in their case with S.B. She testified Father was ordered to receive parent aide services,

parenting education classes, domestic violence classes, supervised visitation, drug screens, substance abuse treatment, and a psychiatric evaluation. She stated he did not complete parent aide services as he did not meet with the services provider, he was offered AMENDS to address the multiple episodes of domestic violence, he did in fact meet S.L., his visits with S.B. were supervised and he attended half of the visits, and, during the visits, he was reported as being aggressive towards the children's mother and during one visit a random man came looking for Father so he had to be excused from the visit. She also testified Father had four visits with S.L., he did not attend all of the visits, and the visits were stopped due to noncompliance with services.

[6] FCM Koehler further testified Father missed twenty-six of fifty-five drug screens. When asked "he talked about how he had a stroke recently and so he couldn't make those particular screens. Were these 26 that he missed, is that since he had a stroke," she answered "[n]o." *Id*. at 90. She indicated Father admitted to using substances throughout the cases, that he admitted at one point to smoking weed, to using methamphetamine around Thanksgiving of 2017, and that he would test positive on December 12, 2017, due to using methamphetamine. She indicated he had three negative screens in May 2019, that she felt that did not provide a complete picture, and that Father had used for the past two years so she would like to see sobriety for a period longer than thirty days. When asked if missed screens around the time he tested negative, she indicated the most recent drug screen he missed was on April 16, 2019.

FCM Koehler also testified Father was incarcerated in January 2018 until April 2018 and again in August 2018 for domestic violence for approximately five months. She indicated Father was unable to care for the children, he was unable to remedy the reasons they were removed from the home, and it is in the best interests of the children that his parental rights be terminated. She testified Father had not been compliant with services, he did not alleviate the issues for which DCS became involved in the first place, he had not completed AMENDS, he "did complete a substance abuse treatment at the end," and there were concerns that he was knowingly violating a no contact order between him and the children's mother due to his continuing to engage her and talk to her. *Id.* at 94. She indicated there was a risk of harm to the children if Father's rights were not terminated, he had not completed domestic violence services, and he had shown a history of domestic violence and battery. On cross-examination, she indicated his last positive drug screen was on July 27, 2018, the last visit he missed was on June 25, 2018, and visitation was placed on hold in June 2018 and never resumed. She stated that she tried to reengage Father in services after he was released from incarceration in January 2019 and that she received a letter in April 2019 indicating he had completed group treatment from Stepping Stone.

Family Case Manager Tyanna Salami ("FCM Salami") testified she became involved in the case in May 2019. She indicated Father was screening before his stroke but had not screened since and that he told her that he had used methamphetamine the day before his stroke. She indicated it is in the best

interest of the children that Father's parental rights be terminated. She testified that she still had concerns about domestic violence, Father told her the previous day that he still has anger issues, and the fact he still sees the mother of the children could potentially mean there will be more domestic violence in the home. She testified it would be harmful for the children to be removed from the foster family, they have established a bond with the family, S.L. only knows his foster parents, S.B. and S.L. are very close, she did not believe Father could care for the children, Father previously was not compliant with his medication regimen, he told her in July that he was driving and he was not supposed to be, she had concerns with him violating the no contact order with the children's mother, and the previous day Father stated that the children's mother had stayed in his house for two and one-half days. When asked if she noticed any changes since he had the stroke, she testified that there was speech aphasia, a delay in understanding what she was saying, and numbness in his arm and leg.

[9]     Court Appointed Special Advocate Anne Laine ("CASA Laine") testified S.L. is not on track developmentally, is experiencing delays in his growth and motor skills, is receiving services including physical and occupational therapy, and he is improving. She testified that, when she met S.B., his growth was not on track and would be medically described as failure to thrive, he received physical and occupational therapy and later speech therapy, he was benefitting from those services, and he has had feeding and breathing issues attributed to prenatal drug exposure. She indicated she did not believe Father was able to care for the children and referenced his limitations due to his health conditions and stroke,

his failure to make progress, the fact domestic violence continued during the case and there were arrests, and his missed and failed drug screens. She indicated she did not believe Father maintained sobriety for any length of time except during his incarceration. She testified that terminating Father's parental rights was in the children's best interests, Father is unable to care for them and meet their needs, their needs are being met by their foster family, and they are bonded to that family and to the sibling group. She also believed there was a threat of harm to the children if Father's parental rights were not terminated and referenced his history of domestic violence, one of the police reports mentioned that he struck the children's mother while she was holding S.B. causing her to drop the baby, and there would be trauma from separation from the foster family.

[10] On October 9, 2019, the court issued orders terminating Father's parental rights as to the children. The court found the children's mother had executed a consent to the adoption of the children. The orders with respect to each of the children provide:

> 1. Father has a significant criminal history that includes multiple incidents of domestic violence.
>
> 2. On July 31, 2007, Father was charged with strangulation, a "D" felony, and battery, an "A" misdemeanor. Father plead guilty pursuant to an agreement to the misdemeanor battery and was sentenced to one year in the Vanderburgh County Jail suspended to probation.
>
> 3. On October 5, 2012, father was charged with Operating a motor vehicle while intoxicated, operating a vehicle while intoxicated with a prior conviction, and operating a vehicle while intoxicated endangering a minor. Father plead guilty and the court withheld judgment for 18

months. Father successfully completed alcohol abuse probation services for 18 months and a misdemeanor conviction was entered as the judgment.

4. On September 14, 2016, father was charged with domestic battery where the defendant has a prior conviction for any sort of battery, a level six felony. These charges resulted from an incident wherein he struck mother who was pregnant at the time with a basket of clothes she was packing in order to leave the residence. These charges were later dismissed as part of a plea agreement concerning three separate instances of domestic violence, wherein he was sentenced to 9 months in the Vanderburgh County Jail.

5. On December 16, 2016, father was charged with intimidation where defendant draws or uses a deadly weapon, a level five felony, and domestic battery where defendant has a prior conviction for any sort of battery, a level six felony. These charges resulted from an incident where father struck his ex-wife in the face in a parking lot of the school. When the juvenile son of the ex-wife confronted father, he grabbed a tire iron out of a vehicle and began chasing the juvenile around the parking lot with it. The juvenile and father then became engaged in a physical altercation. These charges were later dismissed as part of a plea agreement concerning three separate incidents of domestic violence, wherein he was sentenced to 9 months in Vanderburgh County Jail.

6. On February 14, 2017, father was charged with domestic battery with bodily injury to a pregnant woman and resisting law enforcement. These charges resulted from an incident wherein he struck mother who was pregnant at the time with a glass cup in the head. As part of an agreement concerning three separate incidents of domestic violence, father pled guilty to "A" misdemeanor domestic battery and resisting law enforcement. He was sentenced to 270 days in the Vanderburgh County jail.

7. On September 13, 2017, father was charged with the domestic battery by means of a deadly weapon, a level five felony; domestic battery where defendant has a prior conviction for any sort of domestic battery, a level six felony; and domestic battery committed in the presence of a child less than 16 years old, a level six felony. These charges resulted from a domestic violence incident wherein father was alleged to have

struck his ex-wife with a shovel. However, charges were dismissed when the prosecutor's office was unable able to communicate with the victim who resided out of state.

8. On January 31, 2018, father was charged with possessing a look-a-like substance while serving time in the Vanderburgh Community Corrections Work Release Program. He plead guilty and was sentenced to 60 days in the Vanderburgh County Jail.

9. On August 30, 2018, father was charged with domestic battery where the defendant has a prior conviction of battery, a level five felony; domestic battery by means of a deadly weapon, a level five felony; domestic battery resulting in serious bodily injury, a level five felony, domestic battery resulting in moderate bodily injury, a level six felony, domestic battery where the defendant has a prior conviction for any sort of battery, a level six felony; and two counts of resisting law enforcement. These charges resulted from a domestic violence incident wherein father pushed mother to the ground and struck her twice in the head with a brick. Defendant entered into a plea agreement and was sentenced to one year in the Indiana Department of Corrections suspended to probation.

10. Father has failed to achieve self-awareness of his issues with domestic violence. Despite his various plea agreements, father denies he has ever committed domestic violence and contends his victims are simply lying. Father has had so many criminal cases for domestic violence he was unable to recall individual instances at trial and repeatedly asked, "What woman?" in an attempt to recall which incident was being discussed. Father has repeatedly violated the current criminal no contact order with mother, and father admits he is uncertain whether or not she is currently pregnant with his child.

11. Father was ordered to undergo an evaluation by the Court to assess his IQ and ability to care for the child. Father was to complete parenting belief classes in order to increase his knowledge of child development and has limited parenting skills. Father struggled with the parenting belief classes and reported that he had no issues with parenting.

12. Father was offered the services of a parent aide through the Fatherhood Engagement Program to assist him with resourcing to pay

his utilities and finding employment. However, father missed multiple sessions and was uncooperative in meeting with the parent aide.

13. Father missed 14 of 28 visits with the child before visits were put on hold due to father's repeated cancellations and no shows, non-compliance with services, and subsequent incarceration. Father last visited with the child on June 10, 2018.[1]

14. Father continues to struggle with substance abuse and has been unable to establish sobriety. Throughout the case, he was largely non-compliant with drug screens, missing approximately 26 out of 55 drug screens offered. Father has not successfully completed the drug treatment. Father denies he has a drug problem. Father last used methamphetamine on June 27, 2019 the day before he suffered a stroke. As a result of the stroke he has experience right side weakness and difficulty with his speech.

15. Father is currently unemployed.

16. Father has been residing at the Rescue Mission homeless shelter since he was released from incarceration in January of 2019. Father claims to own his own home. However, father has no utilities in that home so he has been residing in homeless shelters. Although father blames his utilities being shut off on his recent stroke, the utilities have been shut off at various points during DCS's involvement. Father had no water or power in his home on the date of removal . . . [on] April 27, 2018.

17. Father admits he is not currently capable of caring for this child. He repeatedly stated that he wanted his adult daughters to care for the child. However the adult daughters have indicated to the family case manager that they are unwilling to care for the child.

Appellant's Appendix Volume II at 34-36, 71-72. The court concluded there is

a reasonable probability the conditions that resulted in the children's removal

---

[1] In its order related to S.L., the court also included the following: "Father has no relationship with the child and erroneously testified that he had never seen the child since he was born." Appellant's Appendix Volume II at 72.

from and continued placement outside the home will not be remedied and the continuation of the parent-child relationship poses a threat to the children's well-being, termination of parental rights is in the children's best interests, and there is a satisfactory plan for the care and treatment for the children.

## Discussion

[11] Father claims there is not sufficient clear and convincing evidence to support the termination of his parental rights. He argues certain findings reflect his purported criminal history prior to the birth of the children, many of the charges were dismissed, he completed substance abuse group treatment, he was complying with drug screens until his stroke, and DCS did not restart visitation after his release from incarceration in June 2018. He cites the Americans with Disabilities Act and argues DCS did not offer any new services or reasonable modifications to accommodate him after his stroke in 2019.

[12] In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[13] A finding in a proceeding to terminate parental rights must be based upon clear and convincing evidence. Ind. Code § 31-37-14-2. We do not reweigh the evidence or determine the credibility of witnesses but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*. We give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand. *Id*. "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id*. at 640.

[14] The involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). In determining whether the conditions that resulted in a child's removal will not be remedied, we first identify the conditions that led to removal, and second we determine whether there is a reasonable probability that those conditions will

not be remedied. *E.M.*, 4 N.E.3d at 642-643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future behavior. *Id.*

[15] The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). A court may consider evidence of a parent's prior criminal history, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services. *Id*. Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.*

[16] To the extent Father raises the Americans with Disabilities Act, we note that he did not raise the issue before the trial court, his stroke occurred months after DCS filed the petitions to terminate his parental rights, and he does not point to

the record to show that he requested any particular services. Turning to the trial court's findings, we note that, to the extent Father does not challenge the court's findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.

[17] The court was able to consider the evidence regarding, and the relative timing of, Father's failure to participate in services and visitation, acts of domestic violence, drug use, and criminal history and incarcerations. We conclude that clear and convincing evidence supports the trial court's determinations that there is a reasonable probability that the conditions which resulted in the children's placement outside the home will not be remedied and that the continuation of the parent-child relationship poses a threat to their well-being.

[18] In determining the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). The court must subordinate the interests of the parent to those of the children. *Id.* The recommendation of a case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied*. Based on the totality of the evidence, we conclude that the trial court's

determination that termination is in the children's best interests is supported by clear and convincing evidence.

[19] For the foregoing reasons, we affirm the trial court.

[20] Affirmed.

Najam, J., and Kirsch, J., concur.